**MURPHY TUGBOAT COMPANY,**
**Plaintiff,**

v.

**Thomas B. CROWLEY et al.,**
**Defendants.**

**SHIPOWNERS & MERCHANTS**
**TOWBOAT CO., LTD., et al.,**
**Counter-Claimants,**

v.

**MURPHY TUGBOAT COMPANY et al.,**
**Counter-Defendants.**

**No. C–74–0189–WWS.**

United States District Court,
N. D. California.

July 27, 1978.

Ronald Lovitt, Henry I. Bornstein, Lovitt & Hannan, San Francisco, Cal., Robert L. Palmer, Martori, Meyer, Hendricks & Victor, Phoenix, Ariz., Thomas Elke, A Professional Corp., San Francisco, Cal., for plaintiff & counter-defendants.

Richard J. Archer, Kristina M. Hanson, Jordon D. Luttrell, Sullivan, Jones & Archer, San Francisco, Cal., for defendants and counter-claimants.

## RULING ON OFFER OF PROOF

WILLIAM W SCHWARZER, District Judge.

This is an action for violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 17043 of the California Business and Professions Code, which prohibits sales below cost. Defendants are several commonly-owned and controlled companies engaged since before 1969 in shipwork, i. e., providing tugs to assist vessels on San Francisco Bay and its tributaries. Plaintiff was organized and entered the shipwork business in competition with defendants near the end of 1971. It ceased operations in 1975. In this action plaintiff charges defendants with attempting to monopolize the shipwork business on San Francisco Bay by means of a variety of practices including the bundling of tug and pilot services, refusing to work jobs in conjunction with plaintiff's tugs, supplying tugs by one defendant to another below cost, and stabilizing the prices charged for shipwork. It is the pricing aspect of this case with which this ruling is primarily concerned.

### I.

The issue before the Court arises upon plaintiff's offer of proof of damages. Plaintiff seeks to recover damages consisting of revenue which it claims to have lost as the result of defendants' failure to raise their shipwork rates responsive to increases in their labor costs.[1] Plaintiff's theory, in substance, is that defendants, as a part of their attempt to monopolize, refrained from increasing their prices to cover their full costs as contract labor rates increased. As a result, plaintiff, compelled to charge competitive rates, was precluded from increasing its rates to higher levels and consequently lost the revenue it would have realized had higher prices been in effect.

The following facts may be taken to be undisputed for purposes of this ruling. At all relevant times, defendants performed the major part of all shipwork on San Francisco Bay and its tributaries. From 1969 until March 1970, however, their operations were idled by a labor dispute. In March 1970, they resumed operations under a new

---

1. Plaintiff submitted its proposed damage study along with other exhibits in advance of the trial pursuant to the Court's pretrial order directing pretrial exchange of exhibits. The damage study, contained in Exhibit 568, was based on revenue losses allegedly suffered by plaintiff as a result of defendants' failure to raise their shipwork prices at various times after 1970. Plaintiff made its offer of proof in response to the Court's announced intention of excluding the damage study incorporated in Exhibit 568. The instant ruling does not preclude plaintiff from presenting proof of damages based on other theories.

labor agreement which provided for substantial increases in labor costs over the next several years. Notwithstanding this cost increase, defendants resumed operations at prices for shipwork approximately the same as those they had charged when the strike began in 1969. Plaintiff makes no claim that these prices were unlawful when they were in effect in 1969.[2] About October 1971, plaintiff entered the San Francisco shipwork business for the first time, using a single tug. It set its prices at approximately the level of defendants' prices for comparable services. In January 1972, about three months later, defendants raised their shipwork prices, although not sufficiently, according to plaintiff, to fully absorb the increased costs and all fixed costs. Plaintiff, whose operation had grown by then, in turn raised its prices in April 1972 to approximately the level of defendants. Defendants did not raise their prices again for two years, until May 1974, when they followed an increase in plaintiff's prices. They raised their prices again a year later in April 1975, to be followed by plaintiff. In September 1975, plaintiff ceased operating.

The question before the Court is whether under Section 4 of the Clayton Act, 15 U.S.C. § 15, plaintiff may recover damages measured by reference to revenues which it contends it would have realized had defendants, by setting their prices at a higher level, made it possible for plaintiff to charge higher prices. That question is different from the question whether defendants, by engaging in a course of conduct which included, among other things, maintaining prices below average full costs, violated Sections 1 or 2 of the Sherman Act or the California Unfair Practices Act. Although the liability issue as it relates to the

damage issue will hereafter be discussed, what we are concerned with here is the proper measure of damages. For that purpose, liability will be assumed.

In examining plaintiff's damage study, a threshold issue is whether plaintiff's proof is too speculative. Even assuming defendants had deliberately refrained from raising their prices at an earlier time and to a higher level in violation of law, one may have to engage in some speculation to compute (1) the higher level at which defendants' prices would otherwise have been set, (2) the level at which plaintiff (with no prior experience in the market) would have set its prices, (3) the total amount of business and competition in the market at the higher price level, and (4) the amount of revenue plaintiff would have realized.[3] For purposes of this ruling, however, we put aside those problems and assume that plaintiff has proved the fact of damage and has overcome any objections based on speculativeness. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564 (5th Cir. 1978); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 87 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

II.

Not every injury causally connected with conduct violating the antitrust laws is compensable. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court held that in order for plaintiffs to recover damages, they must prove antitrust injury, i. e., injury of the type the antitrust laws

---

**2.** Plaintiff contends that defendants' failure to charge higher prices when they resumed operations in March 1970 was due to the recent entry into the market of a new competitor, Murphy-Pacific Marine Salvage Corporation, whose tugs defendants acquired about one year later in June 1971. These facts, although perhaps relevant to motive and purpose, do not affect the resolution of the issue before the Court.

**3.** Inasmuch as this case involves, not reductions in established prices, but alleged failures to increase prices to meet increased costs, damages could not be computed with reference to pre-existing prices which had prevailed in the market before the unlawful acts occurred. See, e. g., *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

were intended to prevent and that flows from that which makes defendant's acts unlawful. In that case, plaintiffs charged that defendant's acquisitions of competing bowling centers violated Section 7 of the Clayton Act, 15 U.S.C. § 18. These centers were acquired by defendant, a large manufacturer of bowling equipment, when they defaulted on their debts to defendant. Plaintiffs' damage claim was based on the theory that but for defendant's acquisitions, the competing centers would have gone out of business, resulting in plaintiffs receiving a greater share of business. Plaintiffs claimed as damages the additional revenue they would have earned on the additional business.

The Supreme Court held that plaintiffs' damage claim was not cognizable and directed entry of judgment notwithstanding the verdict for defendant on the damage claim. The Court stated that to recover damages, plaintiffs must prove more than that Section 7 was violated and that as a result they were in a worse position than they would otherwise have been. To allow recovery of any loss causally linked to the presence of the violator in the market "divorces antitrust recovery from the purposes of the antitrust laws . . . ." 429 U.S. at 487, 97 S.Ct. at 696.

The Court went on to explain:

"If the acquisitions here were unlawful, it is because they brought a 'deep pocket' parent into a market of 'pygmies.' Yet respondents' injury—the loss of income that would have accrued had the acquired centers gone bankrupt—bears no relationship to the size of either the acquiring company or its competitors. Respondents would have suffered the identical 'loss'— but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents, . . .

> \* \* \* \* \* \*

"At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. The damages respondents

obtained are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for 'the protection of *competition*, not *competitors*,' *Brown Shoe Co. v. United States*, 370 U.S. 294 at 320, 82 S.Ct. 1502, 8 L.Ed.2d 510. It is inimical to the purposes of these laws to award damages for the type of injury claimed here.

> \* \* \* \* \* \*

"And it is quite clear that if respondents were injured, it was not 'by reason of anything forbidden in the antitrust laws': while respondents' loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful.

> \* \* \* \* \* \*

"Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. at 125, 89 S.Ct. 1562." 429 U.S. at 487–489, 97 S.Ct. at 696–697.

Under *Brunswick*, this Court must determine whether the damages plaintiff seeks would compensate it for injury "of the type the antitrust laws are intended to prevent," or whether they are merely "profits [it] . . . would have realized had competition been reduced."

■■■ Plaintiff tries to distinguish *Brunswick* on the ground that it arose under Section 7 of the Clayton Act, which may be violated although no compensable injury is incurred. By way of contrast, plaintiff argues, there can be no violation of Sections 1 or 2 of the Sherman Act without actual injury. The argument is defective in several respects. First, *Brunswick* turns on the Court's interpretation, not of Section 7, but

of Section 4, which is the damage provision governing recovery under any of the antitrust laws. Second, a violation of Section 1 or 2 may occur without resultant damage; a plaintiff may, for example, prove the existence of an illegal price-fixing agreement and yet fail to prove recoverable damages. See *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262–63 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1971); *Gray v. Shell Oil Co.*, 469 F.2d 742, 748 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* on which plaintiff relies, merely stands for the proposition that the trier of fact may infer from the proof of wrongful conduct and its tendency to injure plaintiff's business that some damages had been caused.[4] But the sufficiency of the proof of some injury is not the issue here; instead, we are concerned with what type of injury is compensable under Section 4.

### III.

█ To determine whether the loss for which plaintiff seeks to recover under its damage proof is, as the *Brunswick* Court put it, compensable injury, we must begin with the fundamental principle that the antitrust laws are intended to protect competition, not competitors. See *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977). Injury suffered by a firm from the competitive process is not compensable, even if the defendants are engaged in unlawful conduct.

█ Plaintiff is, of course, entitled to recover for its loss and injury proximately caused by wrongful acts proved to have been committed by defendants. In a case involving partial or total exclusion from the market, the trier of fact may draw reasonable inferences and make a reasonable estimate of damages, based on the market share, revenues and profits which plaintiff would have enjoyed but for defendant's unlawful practices. *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 123–125, 89 S.Ct. 1562; *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). Plaintiff may prove profits lost on business diverted from it as a result of defendants' anticompetitive conduct, see *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), and lost future profits or the going concern value of his business. *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659 (5th Cir. 1974); *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61 (1st Cir. 1970).

To permit plaintiff to recover damages in the form of additional revenues from higher prices which it may have charged had defendants, its competitors, raised their prices would, however, require the Court to accept the proposition that the Sherman Act vests plaintiff with a protectible interest in a price level resulting from having its competitors price above full costs, i. e., above the level of average variable costs to which legitimate competition would tend to lower it. In the Court's view, that proposition would contravene the purpose of the Sherman Act, described as follows in *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958):

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the

---

4. That the Court in *Zenith* did not suggest or assume that proof of a violation requires proof of damage (and hence establishes the fact of damage) is confirmed by footnote 9 in which it said in part:

Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9.

In other words, proof of the fact of damage is a requirement distinct from the requirement of proof of illegal conduct.

highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition."

### A.

To support its damage theory, plaintiff argues that pricing below full cost for the purpose of excluding or injuring competitors may be found to violate Section 2 of the Sherman Act. In this connection it cites *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358–59 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), in which the Court of Appeals said:

"To demonstrate predation, Hanson had to show that the prices charged by Shell were such that Shell was foregoing present profits in order to create a market position in which it could charge enough to obtain supranormal profits and recoup its present losses. This could be shown by evidence that Shell was selling its gasoline at below marginal cost or, because marginal cost is often impossible to ascertain, below average variable costs.

\*    \*    \*    \*    \*    \*

"Hanson's failure to show that Shell's prices were below its marginal or average variable costs was a failure as a matter of law to present a prima facie case under § 2."

Plaintiff does not claim that defendants' prices were below average *variable* costs. But plaintiff points to footnote 5 in which the *Hanson* court said:

"An alternative possibility might be a showing that the defendant charged a price which, although above marginal or average variable costs, was below its short run profit-maximizing price and that barriers to entry were great enough to prevent other entry before the predator could reap the benefits of his oligopolistic or monopolistic market position. . . . There is some question, however, whether pricing below a profit maximizing point which is still above marginal and average variable costs should be considered predatory; it only discourages inefficient new entrants who must have higher prices to survive." 541 F.2d at 1358 n. 5 (citation omitted).

Plaintiff contends that its evidence will show that defendants priced below the short-run profit-maximizing price and that they created barriers to entry sufficient to allow them to reap the benefits of their market position.

█ Plaintiff's arguments must be rejected for a number of reasons. First, even assuming the *Hanson* footnote stated the law in this Circuit, and plaintiff were permitted to rely on prices above average variable cost (along with other evidence) as proof of its attempt to monopolize case, it does not follow that plaintiff could recover as damages added revenue it could have realized had defendants set their prices at higher levels, thereby allowing plaintiff to raise its prices. For the reasons stated in the following paragraphs, the appropriate measure of damages in such a case would be the profit which plaintiff would have realized from business it was caused to lose by defendants' unlawful conduct, and the value of its business if it was forced out of existence, not the added revenue from a non-competitive price level maintained in the market.

Second, the speculative dictum of the footnote does not in fact represent the law in this Circuit. In *Janich Bros. v. American Distilling Co., supra,* the Court of Appeals took the position that "an across-the-board price set at or above marginal cost should not ordinarily form the basis for an antitrust violation." 570 F.2d at 857 (footnote omitted).[5]

5. The court's statement implicitly permits differential pricing in different markets, so long as none of the different prices falls below marginal or average variable cost. Differential pricing may, however, introduce the separate issue of price discrimination under Section 2(a) of the

The court went on to explain its reasoning:

"First, a firm setting its price equal to marginal cost will injure other firms more than it will injure itself only if the others are less efficient. More efficient firms will be losing less or even operating profitably. Second, a rule requiring a firm to increase its price above marginal cost in order to avoid a charge of illegal conduct would operate to reduce production, causing a loss of output which could be produced at a cost equal to or lower than its value to consumers. For both reasons, therefore, 'pricing at marginal cost is the competitive and socially optimal result.'" 570 F.2d at 857 (footnotes and citation omitted).[6]

The court affirmed a directed verdict for defendant on the Section 2 claim, holding in part that evidence of sales below full cost but above average variable cost was not sufficient proof of predatory conduct to go to the jury.[7]

■ The *Janich* case confirms that prices set at or above marginal, or average variable cost are pro-competitive, not anti-competitive.[8] That, of course, does not mean

Robinson-Patman Act, 15 U.S.C. § 13(a). Discriminatory pricing, coupled with evidence of predatory conduct or purpose, may permit an inference of probable injury to competition. See *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). But see Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 724–5 (1975) (cited as *Areeda & Turner*), suggesting that even discriminatory prices set at or above marginal cost should not be construed as lessening competition and prohibited by the Robinson-Patman Act. No such charge is made in this case. Plaintiff does not contend that defendants engaged in price discrimination; it simply points to differences in pricing behavior by defendants in different markets as evidence of predatory intent. It is therefore not necessary to address the measure of damage issue in a price discrimination case. See generally the discussion in *International Air Ind. Inc. v. American Excelsior Co.*, 517 F.2d 714, 721–726 and n. 32 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

6. The analysis of the *Janich* opinion is developed in *Areeda and Turner, supra*. The authors show that pricing at marginal cost reflects competition on the merits, even if detrimental to less efficient firms, and hence should not be condemned as predatory. At that price, the producer in a monopolistic market maximizes output and revenue, i. e., at a higher price, he would forego revenue from additional output while at a lower price, his *additional costs* would exceed the incremental revenue. The public, of course, also benefits from having the maximum output sold at the lowest price.

In a market of two or more producers, as in this case, the more efficient, i. e., lower cost producer could raise its price to the level of the least efficient producer, as the quoted portion of the *Janich* opinion points out. To do so would presumably protect the latter against the adverse impact of competition but it would not necessarily maximize either the short run or

the long run profit of the low-cost producer. The latter, so long as he is facing a negatively sloping demand curve, could, by lowering his price, increase his output and his revenue until his price drops to the level of marginal cost. Any rule which precludes him from doing so, or which would make it unduly risky to do so, such as that implicit in plaintiff's damage claim, would tend to deprive the public of the benefits of competition and hence would be inconsistent with the purpose of the Sherman Act. See *Areeda and Turner, supra*, at 704–712. *See also* Samuelson, *Economics* (10th Ed.) 518–520 (cited as *Samuelson*).

The present case, of course, injects the additional policy consideration implicit in a rule which would impose a legal obligation on producers to *raise* their prices as cost increased in order to protect their less efficient rivals. See *Samuelson* at 824–825. Particularly in an inflationary period, such a rule would tend to make enforcement of the antitrust laws counterproductive.

It is no answer to say that antitrust sanctions would apply only where sufficient evidence of an intent to monopolize is found. The burden and uncertainty of antitrust litigation, coupled with the ultimate threat of treble damages, would be sufficient to compel producers to resolve all doubts in favor of setting higher rather than lower prices.

7. Inasmuch as marginal cost is normally not known or readily ascertainable, average variable cost is used as an adequate substitute. *Janich Bros. v. American Distilling Co., supra*, at 858; *Areeda and Turner, supra*, at 716.

8. As the opinion in *Janich* points out, pricing may be regarded as predatory under the Sherman Act only where a firm foregoes short-term profits in order to develop a market position which would enable it to raise prices later and recoup its losses. 570 F.2d at 856. Therefore, in addition to pricing below average marginal cost, an integral element of any predatory pric-

that the firm setting its prices at that level may not be guilty of antitrust violations as a result of other acts. It may, for example, set its prices at or above marginal cost as a part of a course of conduct intended to exclude competitors from the market. Any loss of revenue suffered by plaintiff as a result of having to match those low prices, however, (instead of enjoying the profits from a higher price level supported by its competitor) is injury which bears no relation to the exclusionary acts which made the defendants' conduct unlawful and may not form the basis of a damage recovery.

A case squarely in point is *Pacific Eng. & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790 (10th Cir. 1977), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160, where the trial court had found that defendant, the major producer of ammonium perchlorate, had violated Section 2 because it had priced its product below full but above average variable cost to compete against plaintiff for government contracts. The evidence established that defendant knew that plaintiff, a smaller company, could not survive at that price level. The court of appeals nevertheless reversed a judgment for plaintiff, saying:

> "The trial court found [defendant] AMPOT must have known it could raise prices without affecting its market share . . . . Under the trial court's holding, *the only way AMPOT could have avoided violating the antitrust laws was to raise prices to a noncompetitive level in order to save its smaller, undercapitalized rival.* AMPOT's decision not to raise prices was held to be predatory conduct in violation of § 2 of the Sherman Act. Considering AMPOT's prices and its other practices together, the court found AMPOT's prices were predatory because they were set with the specific intent to drive PE from the market.

"We believe there are fundamental flaws in the trial court's application of the Sherman Act. The court's holding that AMPOT's conduct was predatory is based on its effect on a competitor rather than its effect on competition. As we said in *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727: 'Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise.' In an industry plagued by falling demand and excess capacity, the sinking of a competitor may be an indication of a healthy competitive process.

> \*    \*    \*    \*    \*    \*

"AMPOT, with knowledge of the consequences, chose to engage in price competition and was found guilty of violating the Sherman Act. The trial court found that a rational, non-predatory duopolist would have employed price leadership to raise the price to a profitable level for both competitors.

"Price leadership is not desirable competitive conduct. Any conduct tending to fix prices has been condemned in the strongest language. *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Conscious parallel pricing is circumstantial evidence of price fixing and may involve many of the same vices. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242 (10th Cir. 1976).

ing case is the presence of barriers to the entry of competitors sufficiently great to make such a course of conduct possible. See *Hanson v. Shell Oil Co., supra,* at 1358 n. 5; *International Air Ind., Inc. v. American Excelsior Co., supra,* at 724–25 n. 31. The entry barriers which plaintiff claims existed here are not the usual technological or financial barriers—it is comparatively easy for a person with proper train-

ing to buy a tugboat and sail it into the Bay—but consisted of exclusionary practices allegedly employed by defendants. Those, however, are not entry barriers relevant to predatory pricing since they are not an inherent characteristic of the market and may at any time be removed by judicial intervention or by defendants themselves.

"In this case, price leadership would invoke virtually all the disadvantages of monopoly. Both PE and AMPOT would have had to restrict output and to incur higher production costs. The selling price of the product would then be forced higher than it would be if one producer left the market. In addition, society would be saddled with the deadweight welfare loss resulting from idle and misallocated plant capacity. We do not believe the antitrust laws should be interpreted to encourage this·result.

\* \* \* \* \* \*

"In the present case, the trial court specifically found that AMPOT's sales were always at prices above average variable cost and 'contributed to the company's cash flow.' These prices also were above AMPOT's marginal cost. AMPOT never reached its shut-down point—the point at which it would incur greater losses by operating than by shutting down. Under the circumstances, selling at these prices was rational, competitive behavior." 551 F.2d at 795–97 (emphasis added, footnote omitted).

See also *International Air Ind., Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Weber v. Wynne*, 431 F.Supp. 1048 (D.N.J.1977).

Finally, even assuming that cases could arise in which revenue lost by reason of defendant's predatory price cuts may be a proper measure of plaintiff's damages, this is not such a case.[9] Here plaintiff seeks to recover additional revenue it would have realized had defendants *raised* their prices,

thereby enabling plaintiff to raise its prices. To acknowledge the failure to receive that added revenue as antitrust injury would not only penalize price competition, as heretofore discussed, but would place the stamp of approval on price leadership and consciously parallel pricing. See *Kastenbaum v. Falstaff Brewing Corp., supra* ; *Pacific Eng. & Prod. Co. v. Kerr-McGee Corp., supra.*

### B.

Although the cases discussed in the preceding section addressed claims under Section 2 of the Sherman Act, the same principles should apply under Section 1. Plaintiff charges that defendants violated Section 1 by conspiring to drive plaintiff out of the market by, among other things, agreeing to fix prices, i. e., by agreeing not to increase their prices. Plaintiff also charges that defendants conspired to exclude plaintiff's tugs from the more lucrative jobs and to tie pilot and tug services to plaintiff's detriment.

The reasons why plaintiff should not recover damages on the theory here proposed are the same as those discussed above in connection with attempts to monopolize through predatory pricing. The purpose of the prohibition against price fixing agreements is to remove impediments to price competition. It is not intended to protect plaintiff against low competitive prices that may make it difficult or impossible for it to stay in business. Much less is it intended to bring about price increases and price leadership.

In the usual price fixing case damages are computed with reference to the

---

**9.** In several cases damage recovery measured by the amount of revenue lost due to unlawful price reductions was permitted but none of those cases considered the issue with which we deal here, i. e., the level to which prices may lawfully be reduced by competition, regardless of whether unlawful conduct may have occurred. In *Story Parchment Company v. Paterson Parchment Paper Co., supra,* plaintiff was allowed to recover losses caused by predatory price cutting in violation of the Sherman Act measured by lost revenue, but the Court's opinion indicates that prices fell below the cost of production. In *Continental Baking Co. v. Old*

*Homestead Bread Co.*, 476 F.2d 97, 110–112 (10th Cir. 1973), cert. denied, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973), lost revenue recovery was allowed where price cuts were found to have violated the Robinson-Patman Act. It does not follow from those cases that a plaintiff is entitled to recover revenues lost as a result of competitive prices being set above average variable costs, particularly in the absence of predatory price cuts; to the contrary, *Janich* and other decisions cited here compel the conclusion that such recovery should not be permitted.

illegally fixed price because the damages flow directly from the maintenance of that price, i. e., a plaintiff has no alternative but to deal at the fixed price level. See, e. g., *Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977) (dealers permitted to recover difference between the price they would have charged and the price they were compelled to charge by reason of a vertical price fixing agreement); *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242 (10th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (producers permitted to recover difference between the price they were paid and the price they would have received but for the unlawful horizontal conspiracy among their customers to depress the prices they would pay producers).

In the present case plaintiff was at all times free to set its prices where it chose. Plaintiff's prices were set at a level where plaintiff believed they should be in order to enable it to compete in the market—they were not set as a result of an unlawful act of defendants. Damages measured with reference to prices charged by the defendants to third parties (the consumers) do not flow from the unlawful conspiracy to drive plaintiff out of the market and may not be used as a measure of plaintiff's injury. To award damages based on defendants' failure to raise their prices would not reflect the conspiracy's anti-competitive effect, i. e., the effort to exclude plaintiff from the market. See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra*, 429 U.S. at 489, 97 S.Ct. 690.

C.

III.

Plaintiff also seeks to recover under the California statute which prohibits sales below cost when made for the purpose of injuring competitors or destroying competition. Cal.Bus. & Prof.Code § 17043. The California statute expressly defines cost as the full cost of doing business, including overhead, depreciation and interest cost. Cal.Bus. & Prof.Code §§ 17026, 17029, 17073. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 389 F.Supp. 1334, 1343 (N.D.Cal.), rev'd on other grounds, 526 F.2d 86 (9th Cir. 1975).

■ It is not necessary at this stage of the litigation to determine whether competitive conduct lawful under the Sherman Act (i. e., pricing at or above average variable cost) may nevertheless be found to be violative of the state unfair practices act.[10] The Sherman Act does not preclude economic regulation by the states reasonably related to a legitimate purpose even if it has some adverse competitive effect. See *Exxon Corp. v. Governor of Maryland*, — U.S. ——, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

■ The question remains, however, whether it would be permissible for plaintiff to recover damages on a theory which, for reasons discussed above, is barred by the pro-competitive policy underlying the Sherman Act. Under Section 17082, a plaintiff is entitled to recover treble damages for violation of the state statute. For a state to permit recovery of three times the amount of revenue lost by plaintiff by reason of its competitor's failure to raise its prices above full costs would inflict so large a penalty that it would operate as a potent force compelling price increases. A company faced with any uncertainty respecting either its costs or the possibility that a competitor may be adversely affected by its prices would tend to opt in favor of price increases. This effect is aggravated by Section 17071, under which any sale below cost shown to have an injurious effect on a

---

10. The California statute forbids below cost sales only when done with an intent to injure competitors or destroy competition. *Dooley's Hardware Mart v. Food Giant Markets, Inc.*, 21 Cal.App.3d 513, 98 Cal.Rptr. 543 (1971). As discussed above, pricing at or above average variable costs should not be interpreted as injurious to competition. Therefore, pricing at variable cost may not violate the California Act. We do not, however, at present, reach the question how the California courts would rule on that issue.

competitor is presumed to have been made with the requisite unlawful intent.[11]

While *Exxon* upheld the power of a state to engage in economic regulation even where it may have an anticompetitive effect, it does not appear to reach the issue before this Court. *Exxon* upheld a Maryland statute outlawing price discrimination among retail gasoline stations in the state. This case concerns the question whether under the California sales-below-cost statute, any firm may be required to pay as damages to a competitor treble the revenue it lost on interstate transactions because of the firm's failure to raise its prices above variable costs, thereby precluding the competitor from raising its price. Thus, this is not a case where the state seeks to deal with a particular economic evil—nothing said herein is to be taken as a ruling on the validity of the prohibition against certain sales below costs. The Court simply holds that damage recovery for sales below cost on the theory proposed here on interstate transactions would tend to inhibit and penalize the legitimate price competition sought by the Sherman Act to such an extent that it cannot be permitted.

### IV.

To sum it up, the damages plaintiff seeks to recover would compensate it, not for the consequences of acts prohibited by the antitrust laws, but for the consequences of market competition protected by those laws. Whatever unlawful acts defendants may have committed, they would still have been entitled to do what they did, i. e., refrain from increasing their prices to accommodate plaintiff in the market. The Court is convinced that no verdict reached upon such damage proof, whether under federal or state law, would be permitted to stand. See *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1352–1353 (3rd Cir. 1975).

Accordingly, plaintiff's damage study incorporated in Exhibit 568 must be excluded.

IT IS SO ORDERED.

11. Inasmuch as any price set below full cost is likely to afford a less efficient competitor a basis for claiming injury, a firm faces a risk of litigation whenever it prices below full cost because under Section 17071 such prices would be presumptively unlawful.