Vincent SHANNON, Trustee in Bankruptcy for Murphy Pacific Marine Salvage Company, Plaintiff,

v.

Thomas B. CROWLEY, et al., Defendants.

No. C–74–0562 WHO.

United States District Court, N. D. California.

Dec. 7, 1981.

Patricia S. Mar, George G. Weickhardt, Feldman, Waldman & Kline, San Francisco, Cal., for plaintiff.

Richard J. Archer, Kristina M. Hanson, Archer, Rosenak & Hanson, San Francisco, Cal., for defendants.

## OPINION

ORRICK, District Judge.

This is an action for damages for alleged violations of §§ 1 and 2 of the Sherman Act,[1] brought by the plaintiff Trustee in Bankruptcy of Murphy Pacific Marine Salvage Company ("MP") against defendants Shipowners & Merchants Tugboat Company,[2] Bay Cities Transportation Company (both hereinafter referred to as "the Crowley companies"), and Thomas B. Crowley, principal officer and controlling shareholder of both companies. Before the Court is the defendants' motion *in limine* to exclude the plaintiff's damage evidence as being too speculative.

■ To test this motion, the Court ordered hearings on the sufficiency of the plaintiff's proof of damages.[3] For the purposes of these hearings this Court assumed the liability of the Crowley companies for predatory pricing had been established.[4]

---

1. 15 U.S.C. §§ 1, 2.

2. Called "Red Stack" by the parties.

3. Held October 6–8, 1981.

4. This Court is far from convinced that were this case to go to trial liability for predatory pricing could be established. MP and its damage expert, Professor McFadden, have both stated its entire damage theory is predicated on such a finding. R.T. at 16, 248. The case on which MP necessarily relies is *Inglis v. ITT Continental Baking Co.*, 652 F.2d 917 (9th Cir. 1981), which would allow this liability to be proven where the defendant's prices are above average variable costs.

The opinion distinguished this holding from previous Ninth Circuit holdings to the contrary, *id.* at 937 & n.27, by limiting them to their particular facts. This reasoning is similar to that undertaken in *In re IBM Peripheral EDP Devices*, 481 F.Supp. 965, 988–89 (N.D.Cal. 1979), which the Ninth Circuit has noted resulted in a deviation from mainstream circuit law.

*Pierce Packing v. John Morrell & Co.*, 633 F.2d 1362, 1367 (9th Cir. 1980).

Further, Judge Schwarzer's opinion in *Murphy Tugboat v. Crowley*, 454 F.Supp. 847, 853–57 (N.D.Cal.1978) ("*Murphy I*"), read the same Ninth Circuit precedent considered in *Inglis* as precluding predatory pricing where prices were above average variable costs, and was affirmed precisely on this point. "Red Stack's pricing, therefore, was not predatory *for the reasons stated by the district court in Murphy Tugboat Co. v. Crowley*, 454 F.Supp. 847, 853–57 (N.D. Cal.1978)." *Murphy Tugboat v. Crowley*, 658 F.2d 1256 at 1259 (9th Cir. 1981) (emphasis added).

MP has not shown that Crowley's prices were below his average variable costs; they in fact have conceded the opposite. Plaintiff's memorandum in opposition to motion in limine to exclude damage evidence at 2–3. Therefore, there can be no liability on this issue, and this Court could alternatively rest its holding on this basis for the same reasons stated in *Murphy I, supra*, 454 F.Supp. at 855–56.

The Court had the plaintiff present to it, in the absence of a jury, all the plaintiff's evidence relating to any damages allegedly suffered, which consisted of 5 live witnesses, 87 exhibits (all of which were admitted into evidence for the purposes of these hearings), and 41 designated excerpts of deposition testimony. After considering all the testimony presented, the voluminous papers and exhibits filed by the parties, and listening to extensive oral argument, the Court has determined for the reasons which follow that the plaintiff's damage evidence fails to meet the requirements of any antitrust damage theory based upon exclusion from the marketplace and, therefore, grants the defendants' motion and dismisses the case for failure of plaintiff to prove an indispensable element of its causes of action under § 4 of the Clayton Act,[5] namely, the fact of injury.

## I

Before commencing the critique of the damage evidence, the Court will sketch in the factual backdrop before which these events took place.

For the better part of the century before MP's attempted entry, the Crowley family had dominated the ship-assist market in the San Francisco Bay.[6] In 1969, a strike began which lasted nine months and involved the Crowley companies, completely shutting down their activities on the Bay for that period.

For some time prior to 1969, Roger Francis Murphy, the vice-president for operations for MP, had been interested in involving his company in ship-assist work. Having acquired several tugs for this purpose (eventually numbering seven) and operating under a labor contract not subject to the strike,[7] his company took center stage and operated virtually unopposed until the reentry of the Crowley companies at the strike's end in March, 1970.

After several months of competition, MP terminated all ship-assist operations. The tugs were sold to the Crowley companies, the only bidders, and operations ceased in June, 1971. Roger Murphy, who wholeheartedly objected to this move, then formed his own company, Murphy Tugboat, which owned a single tug and survived in business from October, 1971, to September, 1975.

Both MP and Murphy Tugboat filed antitrust actions in this Court. Although the cases were consolidated for discovery, a related case motion was denied. The Murphy Tugboat case, styled *Murphy Tugboat v. Shipowners & Merchants Towboat Co.*, covering the period from October, 1971, to September, 1975, then went through a 25-day trial and 5 days of jury deliberation which resulted in a finding of liability and heavy damages assessed against the Crowley companies and Crowley as an individual. Judge Schwarzer then granted a motion for judgment *non obstante veredicto*[8] based primarily on the premise no damages were or could have been sustained by Murphy Tugboat as a result of the defendants' actions. The present lawsuit, covering the period from March, 1970, to October, 1971, guided by different counsel under an allegedly new theory of damages developed by Murphy Tugboat's expert, Professor McFadden,[9]

---

**5.** 15 U.S.C. § 15 provides:
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

**6.** Ship-assist work consists of providing tugboats with or without inland pilots to assist seagoing vessels in docking and undocking.

**7.** Negotiated with this goal in mind by MP's parent company, Murphy Pacific Corporation.

**8.** *Murphy Tugboat v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841 (N.D.Cal.1979), aff'd, 658 F.2d 1256 (9th Cir. 1981) (*"Murphy II"*).

**9.** Professor McFadden, who received his degree from the University of Minnesota, is currently a professor of economics at MIT, prior to which he served on the faculty of the University of California at Berkeley. He has co-authored several books and written a number of articles on the economics of transportation.

and with the theoretical benefit of the recent Ninth Circuit case of *Inglis v. ITT Continental Baking Co.*, 652 F.2d 917 (9th Cir. 1981), then came on for trial before this Court.

## II

### A

The Court now turns to the damage issue and begins with an examination of the antitrust damage principles applicable in market exclusion cases such as this.

In *Murphy Tugboat v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841, 863 (N.D.Cal.1979), *aff'd*, 658 F.2d 1256 (9th Cir. 1981) (hereinafter cited as "*Murphy II*"), an excellent, well-reasoned opinion, Judge Schwarzer sets out the three paradigmatic procedures for proof of damages in a market exclusion case:

1. Comparison of the plaintiff's performance before and after the wrongful conduct in a market otherwise similar.

2. Comparison of the plaintiff's performance in markets both restrained and unrestrained by the wrongful conduct which are otherwise comparable.

3. Loss of specific business or customers.

The plaintiff has not even attempted to make the MP damage studies conform with any of these methods. There is no evidence of MP's performance in the market before and after the actions of Crowley.[10] MP cannot offer evidence of its *own* performance in different markets, because it operated solely in the San Francisco Bay. Nor has MP attempted to show specific business or customers lost as a result of Crowley's actions.[11]

The significance of following one of these methods is to assure that the plaintiff's proof of damages is sufficiently nonspeculative to show the amount definitely attributable to the defendant's conduct. *Id.* at 863 & n.19. Since the plaintiff has not availed

himself of any of these three damage theories, the Court must examine the sufficiency of the methods on which MP did proceed, and the cases cited in support of these methods.

### B

In each of the cases cited by the plaintiff in his brief and supplementary brief on damages as authorizing his method of proof of damages, there is an objective indicium of the competitive price level against which the various plaintiffs sought to measure their damages.

*Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *Dean Foods Co. v. Albrecht Dairy Co.*, 396 F.2d 652 (8th Cir. 1968); *Herman Schwabe, Inc. v. United Shoe Corp.*, 297 F.2d 906 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); and *American Crystal Sugar Co. v. Mandeville Island Farms, Inc.*, 195 F.2d 622 (9th Cir.), *cert. denied*, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952), in each instance involved a competitive market price which existed, however fleetingly, before the defendants' actions caused it to drop. The measure of damages is the difference between the two objectively determined levels. These cases are inapplicable to MP's situation, since at no time was there a competitive market price prior to the actions of the Crowley companies.

*Malcolm v. Marathon Oil Co.*, 642 F.2d 845 (5th Cir. 1981), permitted a plaintiff to project a price level *based on the plaintiff's extensive business history* at seventeen locations, a record which MP does not have. *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.*, 358 F.2d 790 (6th Cir. 1966), involved a plaintiff comparing its *own actual* revenues in two contiguous, comparable

---

**10.** Nor, in the view of its monopoly position in the market before the reentry of the Crowley companies, could it be said market conditions were comparable in both circumstances except for the activity of the defendants.

**11.** R.T. 25.

markets, which MP does not do. *North Texas Producers Ass'n v. Young*, 308 F.2d 235 (5th Cir. 1962), *cert. denied*, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963), in which breach of a distributor's contract with a producer was induced by anti-competitive practices, allowed as damages the difference between the contract prices and the actual prices the distributor paid for the milk elsewhere; again, both levels have an objective determination. *Union Carbide v. Nisley*, 300 F.2d 561 (10th Cir. 1961), *appeal dismissed*, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962), allowed a jury discretion to set the price suppliers should have received for their ore so long as the price was lower than the objectively determined market price for the processed ore less the defendant's costs for processing the ore. *Ohio Valley Electric Corp. v. General Electric Co.*, 244 F.Supp. 914 (S.D.N.Y.1965), permitted consumers in a price-fixing case to measure their damages as the difference between the discount from book value which existed before the price-fixing was discovered with the discount which prevailed afterward, neither figure requiring any projection on the part of the fact finder. Finally, *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 955 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960), which permits comparison of a defendant's prices in two localities, as MP seeks to do, was a price discrimination case in the Tenth Circuit, not a Sherman Act case.

None of MP's measures are based on objective figures determined in the market, as in these cases, with the exception of its attempt to compare the prices of the Crowley companies in San Francisco and Los Angeles. The "yardstick" or "measuring rod" test which MP seeks to use is the appropriate one where the plaintiff has been driven out of business before compiling an earnings record sufficient to estimate lost profits. *Lehrman v. Gulf Oil*

*Corp.*, 500 F.2d 659, 667 (5th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). However, the yardstick method requires a comparison of the plaintiff's *own* business with one nearly as identical as possible. *Id.; Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). Although MP at no point attempts such a comparison, this Court will nevertheless turn to MP's methods to see if in some novel way damages can be sufficiently proven without resort to "speculation, surmise, and conjecture." *Wolfe v. National Lead Co.*, 225 F.2d 427, 434 (9th Cir.), *cert. denied*, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955).

### C

The plaintiff lists five different yardsticks for determining the competitive price market for tugboat services:

1. *Comparison of prices charged by the Crowley companies in San Francisco and Los Angeles.*[12]

As stated *supra*, the case law requires a comparison of a plaintiff's *own* business with one nearly identical. *Lehrman, supra*. MP can cite only a price discrimination case for what it seeks to do here, which is a different fact situation comparing the variance in price of identical commodities. Even if this Court were to allow this method in theory, the plaintiff's offer of proof as to the comparability of the two markets is rejected by the Court because it does not take into account the nine-month strike suffered in San Francisco which did not have a counterpart in the Los Angeles market.[13] The strike totally disrupted the relationship between the businesses and their customers in San Francisco by causing a marked increase in "no-tug" docking[14] and requiring a concerted effort

12. Plaintiff's Exhibit 637.

13. Deposition of Bernard Johnson, Vol. II at 173.

14. R.T. 398–99.

on the part of the Crowley companies to again interest customers in using tugs.[15]

Furthermore, Professor McFadden testified it was easier to raise prices in San Francisco because the less adverse geographic conditions in Los Angeles made "doing without" an alternative,[16] yet the competitive price in Los Angeles was higher than MP's monopoly price during the strike.[17] This indicates the presence of some factor not taken into account by the study. Thus, these several reasons compel the rejection of this method.

2. *Percentage increase required in the Crowley companies' average price necessary for them to break even or earn a profit.*[18]

■ The plaintiff has cited no case approving a method such as this. The latter half of the study, which projects a theoretical profit for the Crowley companies, is quickly dismissed, since there is no case allowing a price level above the competitive price. As Judge Schwarzer noted in *Murphy Tugboat v. Crowley*, 454 F.Supp. 847, 853 (N.D.Cal.1978) (hereinafter cited as "*Murphy I*"):

"To permit plaintiff to recover damages in the form of additional revenues from higher prices which it may have charged had defendants, its competitors, raised

their prices would, however, require the Court to accept the proposition that the Sherman Act vests plaintiff with a protectible interest in a price level resulting from having its competitors price above full costs, i.e., above the level of average variable costs to which legitimate competition would tend to lower it."

See also *Northern Pacific R. R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958) ("[T]he policy unequivocally laid down by the Act is competition").

Bearing in mind this statement of the applicable law the percentage increase required for Crowley companies to break even is a deficient measure in two ways. First, it has no direct relation to the competitive price and, second, it requires speculation that the market at the end of a strike would have supported this level or speculation as to what other level the market might have supported. There is no support for these speculations because Professor McFadden's basis for deciding demand was inelastic,[19] does not take into account and contradicts his later testimony.[20] Professor McFadden fails to explain why, if demand was inelastic, the level of no-tug docking did not return to prestrike level within two years after the strike. Thus, this method must be disregarded by the Court as being too speculative.

15. Deposition of William Figari, Vol. I at 59–60.

16. R.T. 370.

17. Plaintiffs Exhibits 252 and 301.

18. Plaintiffs Exhibits 609–1 and 609–2.

19. Based on a comparison of no-tug dockings in 1971 and 1972 showing no increase after a 50 percent price increase by the Crowley companies.

20. R.T. 398–99. Professor McFadden testified that the number of no-tug dockings increased by a factor of four after the strike between 1969 and 1970. This sort of contradiction recurs elsewhere in the Professor's testimony. Although he testified at one point that he used the November, 1969, tariff for the Los Angeles Crowley company in order to compare his May, 1970, study of the San Francisco market with a rate currently in effect (R.T. 320–22), he later admits he made use of a tariff which did not go into effect until November, *1970.* R.T. 390. He was additionally unsure whether MP had only small tugs or large and small tugs. R.T. at 360. He needed to rely on plaintiff's counsel for the difference in pre-strike and post-strike no-tug dockings, since he did not make that calculation. R.T. 399. He could not reconcile his statement that MP could not lower its prices below the Crowley companies during the period of competition with MP's ability to handle the tug work on the Bay as practically a sole operator during the strike. R.T. 364. Finally, although there was evidence the ship-assist business regarded labor as a fixed cost (R.T. 140, 187), Professor McFadden stated that his testimony as to the percentage increase in prices needed for the Crowley companies to cover variable costs was based on his economist's definition of labor as a variable cost. R.T. 339, 404–10. Although on this motion the Court will not judge the general credibility of this witness and does not find such a determination necessary to its disposition, it notes that such contradictory testimony from an expert witness might result in jury confusion were it to be presented at trial.

3. *Percentage increase required in the Crowley companies' prices necessary to reduce the labor-to-revenue ratio to 50 percent.*[21]

■ As with the previous measure, there is no case which approves this method of computation, and there is no direct relation of the level of a competitive price to the maintenance of this ratio. Further, there is testimony that this was essentially an internal management tool for monitoring the efficiency of the dispatchers in utilizing a fixed cost—labor, or the number of crews on hand—in generating revenue.[22] Testimony showed the ratio was only considered among all the other factors in setting rates,[23] and there was no evidence from MP showing a more direct connection between the daily fluctuations in this ratio and the price levels of the Crowley companies. The Court, therefore, finds this method too speculative a basis for damages.

4. *The effect of the Red Stack Pilots' Agreement on prices.*[24]

For a description of this agreement and the reasons no damages may flow from its operation, *see Murphy II, supra,* 467 F.Supp. at 854–58. This Court will follow the reasoning of that previous decision as affirmed by the Ninth Circuit.

5. *Average percentage increase in Red Stack's tariffs after January 1, 1972.*[25]

■ For this final measure, the plaintiff again cites no case which states that damages may be measured by a price increase put into effect seven months after the plaintiff has ceased operations. While this may be relevant to intent and liability, it is not an adequate measure of damages in that it lacks any showing by the plaintiff that the market conditions were sufficiently similar, 22 months after the strike, to the period in which the parties were in competition. Thus, the Court finds this measure to be inadequately sufficient for proof of damages.

## D

It is symptomatic of the ethereal foundation of the plaintiff's damage case that even if some of the above methods *were* considered sufficiently probative, the balance of the damage exhibit is equally insubstantial and riddled with flaws.

After presenting this array of percentages generated by the above five methods, which vary from 20 to 70 percent,[26] the plaintiff would ask the jury to choose some number within the range of 35 to 65 percent[27] with no objective prompter to indicate one percentage is any closer to the competitive level than another.[28] The percentage chosen is then to be applied to a revenue figure for MP. This procedure suffers from a theoretical shortcoming in that the percentage is what is necessary for the *Crowley companies* to reach this price level, rather than the percentage increase MP would have realized in its *own* revenues if business had proceeded at the competitive level. This inaccurate computation cannot be permitted because it would result in a windfall to the plaintiff. Presumably, since the Crowley companies were at a lower price, the percentage increase would be greater than one based on MP's own prices. The treble damage provision sufficiently punishes the malefactor without permitting a procedure such as this. Even if the Court were to permit these unfounded percentages to then be applied to MP's revenue,

21. Plaintiff's Exhibit 609–3.

22. R.T. 187–88.

23. Deposition of Figari, Vol. VI at 501.

24. Plaintiff's Exhibit 609–4.

25. Plaintiff's Exhibit 609–5.

26. Plaintiff's Exhibit 609–6.

27. Plaintiff's Exhibit 609–7. There is no explanation why the ends of the range are narrowed from one exhibit to the next unless it was to avoid the appearance of undue greed.

28. One may as well base the selection on the highest batting average in the National League last year, since it certainly has as much relevance as any of the other figures and also falls within the limits of Plaintiff's Exhibits 609–6 and 609–7.

the lack of certainty in the latter figure has been alluded to by various witnesses throughout the transcript of the proceedings.[29] It is then this "scientifically precise" figure which the Court is to carry through several more years until the time of the bankruptcy of the parent company, and then treble the resulting figure. In short, this is exactly what Judge Friendly castigated in *Herman Schwabe, supra,* 297 F.2d at 912:

> "These comments are especially pertinent to an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it."

■ As for the claim for damages in the sale of the tugs to Crowley, there is no evidence that the tugs were sold at anything less than the best offer MP could receive for them[30] or that the Crowley companies so dominated the tugboat resale market that it was impossible for MP to receive a fair market price. Thus, there is no proof of damages in the sale of the tugs, and the claim has the distasteful appearance of a plaintiff seeking to insure itself against a buyer's market.

### III

The Court therefore grants the defendants' motion *in limine* to exclude the plaintiff's damage evidence as being too speculative. Since proof of damages is an essential element of this cause of action, the Court finds that MP has failed to state a claim and dismisses the action. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 490, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977); *Wolfe, supra.* The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Counsel for defendants will lodge a form of judgment approved by plaintiff on or before December 14, 1981.

---

**29.** Support for this hyperbolic statement may be found in R.T. 55–56, 106–107, 266–67, 436–37, 439; Lee Christiansen testimony at *Murphy Tugboat* trial, R.T. 3256–58; deposition of Rog-

er Murphy, Vol. I at 70–71; deposition of Whitney Olsen, Vol. I at 28–29, 47–48.

**30.** The Crowley offer was the only one received by MP. R.T. 51–52, 433.