Douglas K. KNUTSON, Arlen N. Benham, Geoffrey Beatty, Laura Duarte, Evan Francis Williams, Joseph W. Berthiaume, Kenneth W. Jackson, Jean E. Nyland, Daniel A. Dutra, Willard B. Kittredge, Robert A. Dutra, and Gayle C. Ely, Plaintiffs,

v.

The DAILY REVIEW, INC., a corporation, Bay Area Publishing Co., a corporation, Floyd L. Sparks, an Individual, William Chilcote, an Individual, Dallas Cleland, an Individual, John Clark, an Individual, Carl Felder, Individually and doing business as Felder Enterprises, Defendants.

No. C–73–1354–CBR.

United States District Court,
N. D. California.

March 21, 1979.

G. Joseph Bertain, Jr., Timothy H. Fine, Patrick J. Carter, Edward Stadum, San Francisco, Cal., for plaintiffs.

Broad, Khourie & Schulz, Michael N. Khourie, Thomas Paine, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

In August 1973 a group of independent newspaper dealers brought suit in this Court against the publishers and certain officers of the newspapers they distributed, alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. After extensive discovery and a lengthy trial, this Court on September 23, 1974, rejected three of plaintiffs' claims for relief but found that the publisher's written Dealership Agreement, which prohibited the dealers from selling their papers to subscribers at a price above the publisher's suggested price, constituted a vertical price restraint that violated Section 1 of the Act. See *Knutson v. Daily Review*, 383 F.Supp. 1346, 1357 (N.D.Cal.1974).[1] Because plaintiffs had the agreement established a "resale-resale price." *Knutson v. Daily Review*, 548 F.2d 795,

---

1. Actually, because the dealers sold their papers to carriers, who in turn sold to the public,

failed to prove either the fact or amount of their injury, however, the Court declined to award damages. 383 F.Supp. at 1384.

■ On appeal, the Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. It agreed that plaintiffs were not entitled to recover on the three claims for relief this Court had rejected. However, it disagreed with the Court's reasons for denying plaintiffs damages for the Section 1 violation. Noting that plaintiffs need only prove *some* damages to establish the fact of damage, and that once the fact of damage has been shown, the amount of damage can be established according to a relaxed standard of proof, the Court of Appeals remanded for a reconsideration of the damage issue. *Knutson v. Daily Review,* 548 F.2d 795, 813 (9 Cir.), *cert. denied,*

800 n.2 (9 Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). For the sake of simplicity, and because the dealers took "all reasonable steps to insure that the carriers sold at the announced subscription price," *ibid.,* this Court will discuss the damage evidence as though plaintiff-dealers sold directly to the public. *See Knutson v. Daily Review,* 383 F.Supp. 1346, 1376 n.35 (N.D.Cal.1974).

2. The Court of Appeals also ordered "a limited remand on the Section 2 count." *Knutson, supra,* 548 F.2d at 800. However, it did not indicate which aspects of this Court's findings should be reconsidered. Having fully weighed the evidence presented at trial, and having considered the legal analysis contained in the Court of Appeals' decision, this Court reaffirms its finding that there has been no Section 2 violation.

Plaintiffs' Section 2 claim was that "sometime prior to 1970 defendants attempted and conspired to monopolize the publication of community or suburban daily newspapers in the southern Alameda County area in violation of § 2 of the Sherman Act, 15 U.S.C. § 2," and that "as an integral part of that attempt to monopolize defendants fixed resale prices, imposed territorial restraints on dealer distribution, and terminated all independent home-delivery dealers." 383 F.Supp. at 1369, 1370–1371. An attempt and conspiracy to monopolize can only be established if plaintiffs have proven that defendants "possessed 'a specific intent to acquire unlawful monopoly power.' " *Id.* at 1371, *quoting Chisholm Brothers Farm Equipment Co. v. Int'l Harvester Co.,* 498 F.2d 1137, 1144 (9 Cir. 1974). Because there was "no indication in the evidence as a whole * *

433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).[2]

The case is now before this Court on remand. Having considered the opinion of the Court of Appeals, the arguments of counsel, and all the evidence presented, both at trial and at a post-trial remand hearing, this Court concludes that plaintiffs are entitled only to nominal damages for defendants' violation of Section 1 of the Sherman Act.

### ANTITRUST DAMAGES

Before discussing the facts of this case and analyzing the Ninth Circuit's damage holding, it may be helpful to reiterate the standards applicable to the computation of antitrust damages. For it is only in the context of a long line of Supreme Court and

of predatory or knowingly unlawful activity in connection with defendants' effort to establish, by contract, the subscription price of their newspapers," *id.* at 1372, and because defendants in fact "took prompt action to bring their distribution practices into compliance with the antitrust laws * * *," *ibid.,* this Court found that there was no specific intent to monopolize and denied plaintiffs relief on their Section 2 claim. *Id.* at 1372, 1376.

The Court of Appeals agreed with the standards used to determine whether there had been a Section 2 violation and disagreed only with the Court's determination that defendants had not knowingly engaged in any unlawful activity in setting a maximum resale price. 548 F.2d at 814. However, despite this disagreement, the Court of Appeals concluded that
" * * * the Section 1 violation alone, or in conjunction with [the publisher's] newspaper acquisitions, the questionable promotional practices, and the padding of circulation figures would have supported a district court finding of specific intent, but that finding was not compelled and *we cannot say that the district court's contrary determination was clearly erroneous.*" *Id.* at 815 (emphasis added).
Despite the Court of Appeals' assertion that defendants' conduct was "knowingly unlawful," the evidence demonstrates that there was no specific intent to monopolize and this Court therefore reaffirms its earlier holding that "[p]laintiffs have failed to prove that * * * defendants attempted or conspired to monopolize the publication of community daily newspapers in the southern Alameda County area." 383 F.Supp. at 1376.

Ninth Circuit antitrust damage opinions that the Court of Appeals' decision can properly be applied to the evidence before this Court.

 Plaintiffs in an antitrust suit have the burden of proving damages. As many courts have noted, this requires them to prove both the *fact* of damage and the *amount* of damage. These are two separate proofs. *See Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9 Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Newberry v. Washington Post Co.*, 438 F.Supp. 470, 483 (D.D.C.1977). For the former, plaintiffs must establish with reasonable probability the existence of a causal connection between defendants' violation of the antitrust law and plaintiffs' revenue-impairing injury. *See Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1205–1206 (9 Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Flintkote, supra*, 246 F.2d at 392; *but see Sunkist Growers v. Winckler & Smith Citrus Products Co.*, 284 F.2d 1, 32 (9 Cir. 1960), *rev'd on other grounds*, 370 U.S. 19, 82 S.Ct. 1130, 8

L.Ed.2d 305 (1962) (plaintiff must provide proof to a "reasonable certainty").[3] For the latter, plaintiffs must show the extent of the financial impact of defendants' antitrust violation. Generally, this can be accomplished through proof of lost profits.

 The measure of proof needed to meet these burdens differs significantly. Plaintiffs must bear a heavier burden in proving the fact of damage than in proving the amount of damage. *See Flintkote, supra*, 246 F.2d at 392. Thus, although a plaintiff cannot recover damages that are uncertain in the sense that they are not the certain result of defendant's violation, once this *fact* of damage has been established, plaintiffs can recover all damages definitely attributable to that wrong, even if the *amount* of damage is uncertain or difficult to ascertain. *See Story Parchment, supra*, 282 U.S. at 562, 51 S.Ct. 248; *Flintkote, supra*, 246 F.2d at 392.[4]

 In calculating damages for antitrust violations, the trier of fact can rely upon probable and inferential as well as direct and positive proof. *See Story Parchment, supra*, 282 U.S. at 561–564, 51 S.Ct. 248; *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 377–379, 47 S.Ct. 400, 71

**3.** Defendant's violation need not be the sole cause of the injury; however, it must be at least a substantial factor in bringing the injury about. *See Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073, 1075 n.3 (9 Cir. 1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971). Moreover, the injury must be of the type the antitrust laws were intended to prevent and must flow from that which makes defendant's acts unlawful. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S, 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Murphy Tugboat Co. v. Crowley*, 454 F.Supp. 847, 850-851 (N.D.Cal. 1978).

**4.** There are two reasons why plaintiff's burden of proving the amount of damages is relaxed in an antitrust case: first, the "self-evident intangible nature of the subject matter"; and second, the recognition that most difficulties in computing antitrust damages arise as a result of defendant's own wrongful conduct. *See Flintkote Co. v. Lysfjord*, 246 F.2d 368, 391 (9 Cir.) *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1977). Precise calculation of dam-

ages is often made impossible where defendant has restrained plaintiff in his profit-making activities, as this restraint obscures the conditions that would have prevailed in a free market. Further, courts have recognized that to allow defendants to escape payment of damages because they have made it difficult for the plaintiff to prove the exact amount of injury would be to permit a wrongdoer to profit by his own wrongdoing. Such defendants should not be permitted to argue that inexact and imprecise damages are improper. If the courts were willing to accept such arguments, potential defendants would be encouraged to act in a manner that would render damages as uncertain and speculative as possible, and this would of course undercut the policies underlying the antitrust laws. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 377–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1207 (9 Cir. 1975).

L.Ed. 684 (1927). It is permitted to make a "just and reasonable estimate of the damage [suffered by plaintiffs] based on relevant data" presented, and these findings will be sustained even if the result is only approximate. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946); *Story Parchment, supra*, 282 U.S. at 563, 51 S.Ct. 248; *Eastman Kodak Co., supra*, 273 U.S. at 379, 47 S.Ct. 400; *Greyhound Computer Corp., Inc. v. Int'l Bus. Mach. Corp.*, 559 F.2d 488, 506 (9 Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). The essential requirement is only that plaintiffs develop a reasonable theory for calculating the amount of damages and that they introduce the data necessary to make this calculation. *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5 Cir. 1974), *rehearing denied*, 503 F.2d 1403, *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); *SCM Corp. v. Xerox Corp.*, 463 F.Supp. 983, at 1019 (D.Conn.1978); L. Sullivan, *Handbook of the Law of Antitrust*, § 251, at 786 (1977). However, "even where the defendant by his own wrong has prevented a more precise computation, the [trier of fact] may not render a verdict based on speculation or guesswork." *Bigelow, supra*, 327 U.S. at 264, 66 S.Ct. at 579, 580. The burden may be relaxed, but it is never eliminated.

## LAW OF THE CASE

In addition to being influenced by these general standards for evaluating damage evidence, the Court must follow the more detailed instructions given it by the Court of Appeals in this case. 548 F.2d 795. First, the Court of Appeals found that the Daily Review plaintiffs had met their initial burden of proving the fact of damage.[5] Recognizing that "[d]ifferent standards govern proof of the fact and proof of the amount of damages," and that to prove the fact of damage, plaintiffs need only offer " 'proof of *some* damage flowing from the unlawful conspiracy,' " the Court of Appeals concluded that The Daily Review "plaintiffs [have] produced evidence that despite circulation drops their net profits would have been higher in some amount" had there been no price restraint. *Knutson, supra*, 548 F.2d at 811, 813. In addition, the Court of Appeals concluded that these "reduced net profits were 'precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause,' " and that therefore, even though there may be "some infirmities in [plaintiffs'] evidentiary showing," these "*infirmities are not so significant as to call into question the fact of damage*, but relate only to the amount of damage." *Knutson, supra*, 548 F.2d at 813, *quoting Zenith Radio Corp., supra*, 395 U.S. at 125, 89 S.Ct. 1562 (emphasis added).

This conclusion might be subject to some dispute, both on the grounds that plaintiffs' evidence of profit loss was found by this Court not to be credible,[6] and because the alleged loss probably was not of "the type

5. There were two groups of independent newspaper distributors who brought this lawsuit, those who sold The Daily Review and those who sold the Argus. On remand, this Court is only concerned with The Daily Review plaintiffs, Joseph W. Berthiaume, Robert A. Dutra, Kenneth W. Jackson, Willard B. Kittredge, Jean E. Nyland, and Evan F. Williams. Gayle C. Ely, the seventh Daily Review plaintiff, did not appeal from the adverse decision below. The Court of Appeals has agreed that the Argus plaintiffs are not entitled to damages, stating that

> " * * * the *Argus* plaintiffs * * * did not meet the-fact-of-damage *Flintkote* test. * * * Unlike other plaintiffs, the *Argus* plaintiffs had a complete failure of proof of damages, not simply some deficiencies in the proof of amount of damages."

*Knutson, supra*, 548 F.2d at 813.

6. Plaintiffs' proof of lost profits was based on a "before/after" theory under which the "before" period was the time during which plaintiffs were restrained from raising their prices and the "after" period was the time subsequent to September 1, 1973, when plaintiffs were free to charge whatever prices they wished. All the Daily Review plaintiffs raised their subscription prices during the "after" period. They all claim increased net profits resulting from this price hike, despite losses in circulation. *See Knutson, supra*, 548 F.2d at 810. As a result, they contend that the evidence proves that their profits would have been higher before September 1, 1973, had they been allowed to charge their subscribers the "profit-maximizing" price.

After considering the testimony and demeanor of the Daily Review plaintiffs, this Court found that their post-September 1973 actions

that the statute was intended to forestall." [7]
*See Brunswick Corp. v. Pueblo Bowl-O-Mat,*
*Inc.,* 429 U.S. 477, 487–488, 97 S.Ct. 690,
697, 50 L.Ed.2d 701 (1977), *quoting Wyan-*

were self-serving and that the evidence taken from the "after" period was unreliable:

> "Since plaintiffs' crucial profit and loss data, * * * was recorded and compiled well after the complaint was filed in the very litigation in which it was to be used to prove actual injury, its credibility is certainly suspect. Plaintiffs clearly had the opportunity to vary their gross income and expense figures during the 'after' period in order to exaggerate the favorable impact that price increases might have on profitability. * * * [S]ome of plaintiffs' profit data strains the Court's credulity to the breaking point. * * *

> " * * * Moreover, when assessing the credibility of these profit and loss statements the Court cannot ignore the fact that the unaudited financial statements originally offered by several of the plaintiffs purportedly reflecting their actual operations indicated significantly higher net profit figures than were reported on those plaintiffs' federal income tax returns for the years in question. * * *

> "Another and equally fundamental weakness in plaintiffs' proof of the fact of damage arises from the artificiality of the 'after' period upon which the claims of lost profits are based. Plaintiffs conceded that '[d]amages must be predicated on real market conditions * * *.' [Footnote omitted.] Yet during the entire 'after' period one dominant market factor—the wholesale price charged by the publisher and paid by the dealers—has been under a court-imposed restraint that prevents defendants from raising that price." *Knutson, supra,* 383 F.Supp. at 1382–1383.

Moreover, as will be seen later in this opinion, the evidence demonstrates that plaintiffs would not have charged a higher price for their papers, even if it had been profitable to do so, because of their fear of publisher response. Because of the need to maintain a uniform sales price and a high level of circulation, the publisher could not have permitted the dealers to raise their prices with the resulting drop in circulation without taking action to protect his interests.

For these reasons, it appears to this Court that there remains a substantial question as to whether plaintiffs have produced evidence that they were in fact injured by defendants' maximum resale price restraint.

7. Because vertical resale price restraints have long been viewed as *per se* violations of Section 1 of the Sherman Act, *see Albrecht v. Herald Co.,* 390 U.S. 145, 151 152, 88 S.Ct. 869, 19 L.Ed.2d 998, *rehearing denied,* 390 U.S. 1018, 88 S.Ct. 1258, 20 L.Ed.2d 169 (1968); *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219, *rehearing denied,* 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678

(1951), courts have not found it necessary to evaluate the anticompetitive consequences of each violation. However, recent case law has called into question the continued application of *per se* analysis to this type of case. *See Continental T. V. Inc., v. GTE Sylvania, Inc.,* 433 U.S. 36, 57–59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (vertical territorial restrictions should be subjected to rule of reason rather than *per se* analysis); *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.,* 572 F.2d 883, 885–886 (1 Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978) (resale price restraint having lesser anti-competitive effect than pure territorial restriction analyzed under rule of reason in light of *Continental*). For this reason, it seems appropriate for the Court to consider whether the purposes of the antitrust laws are truly served by a finding that plaintiffs have proven a violation and the fact of injury. *See Brunswick, supra,* 429 U.S. at 487–488, 97 S.Ct. 690, 697 (respondents not allowed to recover under Clayton § 7 for lost profits suffered when large manufacturer acquired their competitors, thus preventing competitors from going out of business; Court held that because respondents sought to recover "the profits they would have realized had competition been reduced," their "injury was not of 'the type that the statute was intended to forestall,' " and that it would be "inimical to the purposes of [the antitrust] laws to award damages for the type of injury claimed * * * "); *Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847, 851–852 (N.D. Cal.1978) (*Brunswick* reasoning applicable to Sherman § 1 claim).

The anticompetitive consequences that usually flow from the imposition of maximum resale price restraints were articulated by the Supreme Court in *Albrecht, supra* :

> "[First,] agreements to fix maximum prices 'no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' [Footnote and citation omitted.]

> " * * * [Second, m]aximum prices may be fixed too low for the dealer to furnish services * * * and conveniences which consumers desire and for which they are willing to pay. [Third, m]aximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant nonprice competition. * * * [Fourth,] if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices." 390 U.S. at 152 153, 88 S.Ct. at 873,

*dotte Co. v. United States,* 389 U.S. 191, 202, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). However, as the law of the case, these findings must be accepted on remand, and this Court must assume the fact of damages. Therefore, all that remains for this Court to do is ascertain the amount of damages to which each Daily Review plaintiff is entitled.

> *quoting Kiefer-Stewart, supra,* 340 U.S. at 213, 71 S.Ct. 259.

None of these "evils" are present in this case. First, even if the restraint "cripple[d] the freedom" of plaintiffs, the Supreme Court has expressly rejected this factor as a basis for imposing antitrust liability. *See Continental T. V. Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 53 n. 21, 97 S.Ct. 2549.

Second, plaintiffs have not alleged that they would have provided additional services or conveniences to their subscribers if they had been allowed to charge a higher price. The motivation for raising prices was to effect a decrease in circulation that, because of the dual rate structure, would lead to higher net profits. Setting higher prices *in order to increase services* would appear to be counterproductive; it would retard the desired circulation drop. ·

Third, there is no indication that the price restraint protected any dealer from "significant nonprice competition." In fact, the dealers did not compete among themselves for subscribers and, if anything, the elimination of the price restraint would have made inter-dealer competition even less likely. The dealers wanted to restrict distribution. Because of the dual rate structure they had no interest in expanding their distribution into other dealers' territories. *See Knutson, supra,* 548 F.2d at 809, 810.

, Fourth, it cannot be said that the price ceiling was actually a cover for a minimum price setting scheme. The resale price was not set at the dealers' cost. Had the dealers wanted to increase circulation, they could have afforded to undercut the suggested price. The reason they chose not to sell at a lower price was simply because they had no need and no motivation to increase circulation once the base level of sales had been reached.

In fact, it is not unreasonable to conclude that defendants' maximum resale price restraint had a pro-competitive effect and that price freedom would have had anticompetitive consequences. By seeking the removal of the resale price restrictions, plaintiffs sought the power to increase profits by raising subscription prices in their areas of distribution. However, because each plaintiff had a *de facto* monopoly in his or her area, these increased profits could only be characterized as monopoly rents. The result of lifting the price ceiling would therefore be to encourage each dealer's fortification and exploitation of his or her particular monopoly. Moreover, because the effect of a price hike would be to decrease circulation, a dealer's freedom to raise prices would logically lead to the elimination of any inter-dealer competition that may have existed on the fringes of each dealer's area of distribution.

This analysis suggests that although plaintiffs' alleged losses may be of the type that the claimed violation would be likely to cause, they are not of the type that the antitrust laws were intended to prevent. For this reason, the Court questions whether plaintiffs should have been found to have demonstrated a violation and resulting fact of injury. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (antitrust laws were enacted for the protection of competition, not competitors); *cf. Albrecht, supra,* 390 U.S. at 156–159, 88 S.Ct. 869 (Harlan, J., dissenting).

## THE AMOUNT OF DAMAGES

■ After considering all the evidence presented at trial, this Court concluded that plaintiffs had failed to meet their burden of proving either the fact or the amount of damage.[8] The Court of Appeals disagreed, finding that this holding, by requiring proof to a reasonable probability that plaintiffs

8. Noting that "[t]he evidence * * * presented * * * amounted to no more than conjectural hindsight and even contained contradictory assertions of interested parties," 383 F.Supp. at 1379, that "[t]he credibility of the evidence is further diminished by the fact that these claims [of damage] were first made during the trial and lack any corroborating circumstantial evidence," 383 F.Supp. at 1380, that "plaintiffs' crucial profit and loss data * * * recorded and compiled well after the complaint was filed * * * is certainly suspect * * * [and] strains the Court's credulity to the breaking point," 383 F.Supp. at 1382, and that "the 'after' period upon which the claims of lost profits are based" constitutes "an artificial rather than a real market experience thereby destroying the probative value of the 'before/after' test relied upon by plaintiffs," 383 F.Supp. at 1383, the Court held

> " * * * that plaintiffs have not shown that there is a reasonable probability that they actually would have increased their prices during the damage period if they had been permitted to do so or that they actually would have realized higher profits had they raised their prices. Consequently, plaintiffs have failed to prove both the fact and amount of damage on their lost profits claim." 383 F.Supp. at 1384.

actually would have raised their prices, created "a nearly insurmountable barrier to recovery in maximum price-fixing cases." *Knutson, supra*, 548 F.2d at 812. As a result, and in order to ease plaintiffs' burden, the Court of Appeals established a presumption that the dealers' pricing policies would have been guided by the principle of profit-maximization. It did so in a paragraph that deserves extended scrutiny, for it is in this paragraph that the Court of Appeals sets forth the guidelines for evaluating the evidence on "amount of damages." The Court of Appeals stated:

"Rather than imposing the nearly impossible burden of proving what each dealer would have done if he had been free to make his own pricing decision, we assume that, absent evidence to the contrary, a dealer would have raised his prices had it been profitable to do so; that is, dealers are profit maximizers. [Footnote omitted.] This assumption merely amounts to a recognition that a 'restraint' in fact restrains. The defendants can attempt to show plaintiffs would have kept their prices beneath a maximizing point despite their violative behavior. Contrary evidence might include dealer testimony that he would not have raised his price, or a showing by the defendants that the dealers had reasons other than the restraint for selling below a profit-maximizing price." 548 F.2d at 812.

Central to the Court of Appeals' holding was its "assumption" that absent the price restraint, each dealer would have raised his or her prices so long as it would have been profitable to do so. Although the Court of Appeals used the word "assume" rather than "presume," the context in which the word appears suggests that the Court was creating a rebuttable presumption that all dealers are profit maximizers. *See Knutson, supra*, 548 F.2d at 816 (Smith, J., dissenting).

But what does this presumption mean? At first glance, the language would suggest that the burden of proving damages—at least in maximum price restraint cases—should be shifted from plaintiff to defendant; that plaintiffs are presumed to have intended to charge the price at which they would have received the greatest profit; and that because a "restraint in fact restrains," this profit-maximizing price is presumed to be higher than the fixed price. However, this interpretation could place on the district court the burden of determining the profit-maximizing price, and the Court of Appeals could not have intended such a result.

The inappropriateness of this result is illustrated by the hypothetical case in which neither party has introduced any evidence as to the amount of damages. In such a case, even though plaintiffs have not shown what their pricing policies would have been, the district court, in presuming that plaintiffs would have raised their prices to the profit-maximizing level, would itself have the burden of determining what that level would be. Because the parties would have introduced no supporting evidence, the district court could only make this determination by combining economic analysis with speculation and conjecture. The district court would first have to determine whether the Court of Appeals' presumption was based on short-term profit maximization or on long-term profit maximization. Then it would have to calculate the optimum price to be charged. In doing so, it would be compelled independently to consider such factors as the effect of a price rise on circulation, the impact of intra- and inter-brand competition, and the response of the publisher to a dealer's pricing change. The obligation to undertake this type of speculative economic analysis should not be thrust on the district courts. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742–743, 97 S.Ct. 2061, 52 L.Ed.2d 707, *rehearing denied*, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977).

Moreover, adoption of this interpretation of the Ninth Circuit's decision would create a conflict with the clear line of judicial authority. In all other cases in which antitrust plaintiffs have sought compensation for lost profits, the courts have required them to introduce at least some evidence of the extent to which defendants' anti-competitive practices caused damage. *See, e. g., Bigelow, supra*, 327 U.S. at 264–266, 66

S.Ct. 574; *Story Parchment, supra*, 282 U.S. at 561, 51 S.Ct. 248; *Eastman Kodak, supra*, 273 U.S. at 379, 47 S.Ct. 400; *Greyhound, supra*, 559 F.2d at 505–506; *Gray v. Shell Oil Co.*, 469 F.2d 742, 748 (9 Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); *Siegel v. Chicken Delight*, 448 F.2d 43, 52–53 (9 Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 471–472 (9 Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1974); *Flintkote, supra*, 246 F.2d at 392–394; *Newberry, supra*, 438 F.Supp. at 483 ("There is simply no proof that provides a basis for determining when, if ever, a price increase would have been attempted by any [plaintiff news dealer] or in what amount * * * "). These courts have dealt with the problem of uncertain damages by relaxing plaintiffs' burden of proof, not by shifting the entire burden to defendants.

For these reasons, it seems more appropriate to interpret the *Knutson* decision in such a way as to maintain the burden of proof on the plaintiffs. This can be done by focusing on the "had it been profitable to do so" language.

The Ninth Circuit "assume[d] that, absent evidence to the contrary, a dealer would have raised his prices had it been profitable to do so; that is, dealers are profit maximizers." 548 F.2d at 812. As noted above, this statement could be read as creating a presumption that absent a restraint, each dealer would have charged the profit-maximizing price, *i. e.*, the price determined by the district court to be profit maximizing. However, the statement can also be read as holding that *once plaintiffs have proved that, absent restraints, it would have been profitable for them to have raised their prices*, the Court must presume their intent to have done so. This interpretation would place on plaintiffs the burden of proving that the profit-maximizing price was greater than the price charged while the restraint was in effect. If plaintiffs produced no probative evidence in support of this contention, then they would not be entitled to damages. However, if they could demonstrate—by use of the before/after test, the yardstick test, or by the use of experts—that they would have profited by charging more for their product than defendants had allowed them to charge, the Court would presume their intent to have done so, and the burden would shift to defendants to offer evidence to the contrary.[9]

The Court of Appeals' statement that a restraint in fact restrains is not necessarily inconsistent with this interpretation. That language should not be read as a declaration that a maximum price restraint restrains only if it is set below the profit-maximizing price and that the district court must therefore presume that the profit-maximizing price was higher than the fixed price. Rather, it should be read merely to state that the restraint imposed by defendants prevented plaintiffs from exercising free choice in setting prices, and that whether plaintiffs would in fact have set their prices above the imposed price still depends on whether they can show that it would have been profitable to have done so. *See Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 53 n.21, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.")

Thus, in evaluating the evidence on remand, this Court will not presume that plaintiffs would have set their prices at a level higher than the fixed price. Rather,

---

**9.** As noted by the Court of Appeals, defendants could rebut the presumption that plaintiffs would have charged the profit-maximizing price by introducing contrary evidence such as

"dealer testimony that he would not have raised his price, or [other testimony] that the dealers had reasons other than the restraint for selling below a profit-maximizing price." 548 F.2d at 812.

It is significant that these examples rebut the presumption that each dealer intended to charge the profit-maximizing price, not the presumption that the profit-maximizing price was higher than the fixed price.

plaintiffs must first demonstrate to this Court's satisfaction that the profit-maximizing price was higher than the fixed price. If the evidence presented does not support that contention, then plaintiffs are not entitled to more than nominal damages.[10] However, if plaintiffs can demonstrate that the profit-maximizing price was higher than the fixed price, then the Court will presume that they would have charged that higher price to their customers, and it will shift the burden to defendants to rebut that presumption.

### THE PROFIT–MAXIMIZING PRICE

In determining whether plaintiffs have met their burden of proving that the profit-maximizing price exceeded the fixed price, the Court must focus on the period from September 1, 1969 to September 1, 1973. This is the time interval during which plaintiffs are potentially entitled to damages, for defendants terminated their illegal dealership agreements with plaintiffs on August 31, 1973, and the applicable statute of limitations for private causes of action under the federal antitrust laws is four years. *See* 15 U.S.C. § 15b; *Knutson, supra*, 383 F.Supp. at 1353.

Plaintiffs concede that from the start of this damage period to January 1, 1971, a period of sixteen months, the profit-maximizing price was virtually identical to the maximum resale price set by defendants. Their expert economist concluded that the prices were "so close" during this period that the dealers "would have followed the suggested price," and none of the plaintiffs alleged that the profit-maximizing price would have been higher. *See* Plaintiffs' Proposed Finding of Fact 17; Transcript, Oct. 13, 1978, at 7; Transcript, Jan. 25, 1978, at 23. Therefore, because there has been no showing that it would have been more profitable for plaintiffs to have charged a higher price for The Daily Review subscriptions from September 1, 1969

to January 1, 1971, this Court finds that plaintiffs are not entitled to any damages for that time period.

Plaintiffs argue that as of January 1, 1971, however, the profit-maximizing price of The Daily Review rose approximately fifty cents per month. On that date, the Oakland Tribune raised its monthly subscription price from $3.25 to $3.75. Plaintiffs contend that the Tribune's pricing policies had a direct competitive impact on their own prices, that their profit-maximizing price was fifty cents lower than whatever price the Tribune happened to be charging, and that this Court should therefore find that as of January 1, 1971, the profit-maximizing price of The Daily Review was approximately $3.25 per month. *See* Plaintiffs' Proposed Finding of Fact 13.

Plaintiffs support this contention with three arguments. First, they point to their own testimony that the price of the Tribune was a significant influence on their pricing policies and that they felt it important to maintain approximately a fifty-cent price differential. *See* Transcript, Jan. 26, 1978, at 18, 29–30, 44–45; Transcript, Jan. 27, 1978, at 56; Plaintiffs' Exhibit Nos. 1009–1014, Affidavits of Robert Dutra, Kenneth Jackson, Willard Kittredge, Joseph Berthiaume, Evan Williams, and Jean Nyland. Next, they point to the historical fact, that the subscription price of The Daily Review was set fifty cents below that of the Tribune from October 1, 1960 to May 18, 1967, from November 1, 1967, to November 1, 1968, and again from October 1, 1969 to January 1, 1971. *See* Plaintiffs' Proposed Finding of Fact 13. Presumably, this indicates that there is a correlation between the profit-maximizing price of The Daily Review and the price of the Tribune. Finally, they note that Floyd Sparks, the publisher of The Daily Review, testified on numerous occasions that his pricing policies were greatly influenced by competition from the Tribune and that fifty cents seemed to be the most appropriate margin by which to

---

**10.** Under most circumstances, plaintiffs who fail to establish the amount of their injury are not entitled to any damage award. However, in this case, the Court of Appeals' determination that "fact of injury" has been established compels a finding that plaintiffs are entitled to at least nominal damages.

undersell that paper. *See* Transcript, Vol. 3, Nov. 16, 1973, 11:50 A.M. Session, at 119; Transcript, Vol. 4, Nov. 30, 1973, 2d Session, at 12; Transcript, Jan. 27, 1978, at 13–14.

In light of plaintiffs' arguments and the testimony adduced at trial and on remand, the Court is willing to find that plaintiffs have met their initial burden of proving that as of January 1, 1971, the profit-maximizing price of The Daily Review rose to approximately $3.25 per month, fifty cents above the maximum subscription price set by defendants. The Court realizes the artificiality of this figure. Certainly the profit-maximizing price is in a constant state of flux and is influenced by many factors, including competition from other newspapers and news sources, the quality of the product, carrier demands, the state of the local economy, etc. However, the Court concludes that plaintiffs have produced enough evidence to show that a fifty-cent Daily Review price hike on or after January 1, 1971 would have led to increased dealer profits, assuming that the publisher continued to sell his papers to them at pre-1971 prices. Therefore, the Court finds that plaintiffs' initial burden has been met.

Having established that the profit-maximizing price was higher than the fixed price after January 1, 1971, the Court must determine whether defendants have rebutted the presumption that plaintiffs would actually have raised their prices to this level. The Court is mindful of the Court of Appeals' suggestion that this rebuttal can consist of evidence such as

> "dealer testimony that he would not have raised his price, or a showing by the defendants that the dealers had reasons other than the restraint for selling below a profit-maximizing price." *Knutson, supra,* 548 F.2d at 812.

After considering the testimony of the witnesses and the evidence presented, this Court finds that defendants have rebutted the presumption, and it therefore finds that plaintiffs are only entitled to nominal damages.

Defendants have rebutted the presumption that plaintiffs would have raised their subscription prices on January 1, 1971 with two arguments. First, they point to subsequent events which demonstrate that plaintiffs would have delayed for a period of at least several months before reacting to the Tribune's January 1, 1971 price hike. Second, they contend that plaintiffs were aware that if they had raised their prices on or after January 1, 1971, the publisher would have been forced to convert his independent distributor system to an employee distribution system or to take some other action that would have jeopardized the dealers' independent status. Knowing that their future existence as independent dealers would have been jeopardized by instituting a price hike, defendants argue that plaintiffs would voluntarily have maintained the publisher's suggested price even though their "profit-maximizing" price may have been higher.

## TIME LAG

In late July 1973, defendants notified all plaintiffs that their Dealership Agreements would be terminated effective at the close of business on August 31, 1973. *Knutson, supra,* 383 F.Supp. at 1353. On August 6, 1973, plaintiffs filed this lawsuit. Shortly thereafter, the parties agreed, *inter alia,* that during the pendency of this litigation, plaintiffs could continue to distribute The Daily Review, setting their own subscription price, but that defendants would be prohibited from selling the papers to them at other than the then prevailing rates. *See Knutson, supra,* 548 F.2d at 801; 383 F.Supp. at 1354. In other words, as of September 1, 1973, plaintiffs could sell The Daily Review at any price they chose while defendants could not raise their prices or react to plaintiffs' decisions in any way.

The existence of this agreement provides the Court with an ideal situation for testing the profit-maximizing presumption. As of September 1, 1973, all of plaintiffs' pricing restraints had been lifted, the publisher's hands had been tied, and the Tribune's selling price had been established at one dollar higher than The Daily Review's. If plaintiffs were truly profit maximizers, they all

would have immediately raised their prices to $3.25 per month. However, they did not. Although plaintiff Berthiaume raised his subscription price on September 1, plaintiffs Kittredge, Williams, and Nyland did not act until October 1, and plaintiffs Dutra and Jackson did not raise their prices until November 1. *Knutson, supra,* 383 F.Supp. at 1378 n.40. These time lags between the date of price freedom and the date of dealer response prove just how fragile the presumption of profit maximization can be.

At a minimum, the Court must find that five of the six plaintiff dealers would have hesitated one to two months after achieving price freedom before raising their prices to the profit-maximizing level. Their delay in responding to the actual lifting of the maximum price restraint compels such a result. Moreover, in light of this Court's earlier determination regarding plaintiffs' credibility, the Court now finds that the time lag would have been greater.

Plaintiffs knew that their entitlement to damages would depend in part on the profits they received after September 1, 1973. They knew that the sooner their prices were raised, the more likely it would be that this Court would find them to be immediate profit maximizers. Their delay in responding to price freedom only shows that the presumption of immediate profit maximization is unsupported here, and that plaintiffs actually would have hesitated for at least a few months before raising their prices to the "profit-maximizing" level. The Court must so find.[11]

## DEALER REACTION

The second piece of rebuttal evidence offered by defendants is even more harmful to plaintiffs' claim for damages. It consists of testimony that the publisher would have responded to plaintiffs' price freedom by converting to an employee distribution system, and that knowledge of the likelihood of this response would have been a "[rea-

son] other than the restraint for [plaintiffs'] selling below a profit-maximizing price." *Knutson, supra,* 548 F.2d at 812.

Although the publisher and the dealers all earned their income through sales of The Daily Review, their strategies for maximizing profits appear to have been in conflict. *See* Transcript, Vol. 11, Feb. 8, 1974, at 304. The publisher, whose gross income was derived 88% from advertising revenue, was predominantly concerned with maintaining a high circulation in order to promote his sales of advertising lineage. *See* Transcript, Vol. 4, Nov. 30, 1973, 2d Session, at 27; Transcript, Vol. 11, Feb. 8, 1974, at 319. Advertising rates are in large part a function of total circulation. The greater the circulation, and therefore the greater the potential market, the more willing advertisers are to purchase space from a newspaper. Therefore, because circulation tends to increase as subscription prices decrease, the publisher can maximize his profit by keeping the price of his paper low. This low price leads to higher circulation and therefore to more substantial advertising revenues. *See Albrecht v. Herald Co.,* 390 U.S. 145, 169 n.2, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (Stewart, J., dissenting); *Knutson, supra,* 383 F.Supp. at 1363; Transcript, Vol. 4, Nov. 30, 1973, 2d Session, at 9.

Unlike the publisher, the dealers' profit picture depends solely upon circulation. *Knutson, supra,* 383 F.Supp. at 1363–1364. Their income is derived exclusively from sales of The Daily Review, not from sales of advertising.

Under the dual rate structure established by the publisher, the dealers pay a base rate for each paper purchased up to a specified number, and a higher rate for each additional paper purchased. *Id.* at 1352 n.4. These payments, plus the carriers' earnings, are subtracted from total subscription revenues to determine dealers' profits. *Id.* at 1351–1352; 548 F.2d at 808. Because a dealer's profit per paper is higher when he

---

**11.** This conclusion is supported by plaintiffs' "Second Supplemental Damage Study," submitted after trial, in which their expert, Dr. David Bradwell, calculated damages based on the assumption that plaintiffs would not have raised their prices until *July* 1, 1971. *See, e. g.,* Plaintiffs' Exhibits 1002B, 1005B, 1006B, and 1007B.

pays the publisher only at the lower base level rate, his most logical profit strategy would be to raise subscription prices to the point that circulation drops to the base level. *See* Transcript, Vol. 9, Feb. 6, 1974, 2d Session, at 25; Transcript, Jan. 27, 1978, at 53. This strategy is obviously in conflict with the publisher's high circulation strategy. *See Knutson, supra,* 383 F.Supp. at 1364.

Sparks, the publisher of The Daily Review, acknowledged that a dealer's decision to raise subscription prices would seriously impair the profitability of his paper. *See* Transcript, Jan. 27, 1978, at 20–21. He had no doubt that a dealer price hike would lead to a drop in circulation that would in turn lead to diminished advertising revenues. *See* Transcript, Vol. 4, Nov. 30, 1973, 2d Session, at 9; Transcript, Jan. 26, 1978, 4 P.M. Session, at 23.[12] This problem would have been particularly severe toward the beginning of the damage period because of the strong competition for advertising revenues then existing between The Daily Review, the San Leandro Morning News, and the Fremont News Register. Transcript, Jan. 27, 1978, at 22. However, the problem would continue so long as advertising revenues were the publisher's main source of income. Moreover, because a diminution of advertising revenues would decrease the funds available for future circulation promotions, a dealer price hike would trigger a downward profit spiral, ultimately leading to tremendous financial losses for The Daily Review. *See* Transcript, Vol. 11, Feb. 8, 1974, at 341; Transcript, Vol. 14, Feb. 14, 1974, at 220.

Sparks recognized also the need to maintain a uniform subscription price for his paper, both to avoid confusion among his subscribers and to make widespread circulation promotions more feasible. *See Knutson, supra,* 383 F.Supp. at 1363, Transcript, Vol. 2, Nov. 15, 1973, at 426; Transcript, Vol. 3, Nov. 16, 1973, 11:50 A.M. Session, at 127, 147; Transcript, Vol. 5, Dec. 1, 1973, at 27. For all these reasons, he testified that he would have responded to price freedom in such a way as to maintain as much control over subscription prices as would have been legally possible. *See* Transcript, Vol. 2, Nov. 15, 1973, at 421; Transcript, Vol. 3, Nov. 16, 1973, 11:50 A.M. Session, at 146; Transcript, Vol. 4, Nov. 30, 1973, 2d Session, at 34.[13]

The Court finds that the need for swift reaction to a dealer price hike in order to maintain price uniformity and advertising revenues would have caused Sparks to respond to dealer price freedom either by immediately converting to an employee distribution system or by converting to a system of free distribution, even if that required cutting back on the frequency of publication.[14] The evidence amply supports this finding. *See* Transcript, Vol. 11, Feb. 8, 1974, at 373; Transcript, Vol. 22, Apr. 25, 1974, at 194, 2 P.M. Session, at 6; Transcript, Jan. 26, 1978, 4 P.M. Session, at 21, 26–28, 44; Transcript, Jan. 27, 1978, at 35–36; Transcript, Feb. 2, 1978, at 148.

Furthermore, this conclusion is not undermined by Sparks' failure to respond to the dealer price hikes that occurred between September 1, 1973, and November 1, 1973. As noted above, the publisher's hands were tied by the stipulation of the parties—ap-

12. Plaintiffs' own expert, Dr. David Bradwell, testified that if the dealers had been permitted to effect the proposed price hike, circulation levels would have dropped approximately 22%. Transcript, Jan. 25, 1978, at 151.

13. Either of these options could have been pursued without violating the antitrust laws, particularly insofar as they would have been the result of a good-faith, valid business decision, having across-the-board effect, and authorized by the explicit terms of the termination clause of the Dealership Agreements. *See Knutson,*

*supra,* 548 F.2d at 804–807; 383 F.Supp. at 1358, 1359–1367.

14. This conclusion is reinforced by Sparks' "termination" letter of July 25, 1973, in which he stated that the conversion of his distribution system was "necessary to obtain closer supervision over our circulation, and in particular over efforts to increase such circulation. * * Any loss in circulation to [our] competitors would adversely affect our advertising revenue." *Knutson, supra,* 383 F.Supp. at 1353–1354.

proved by the Court—that enjoined him from refusing to sell The Daily Review to plaintiffs at the established rates. *See Knutson, supra,* 383 F.Supp. at 1354. He was thus prohibited from raising his prices or from terminating their distributorships during the pendency of the litigation. The publisher's inaction during the post-September 1, 1973 period does not therefore provide probative evidence of whether Sparks would have converted to a new distribution system when the dealers gained price freedom.

## DEALER AWARENESS

The presumption that plaintiffs would have charged the "profit-maximizing" price cannot be rebutted merely by evidence that their dealerships would have been terminated if they had raised their prices. If plaintiffs were unaware that the publisher would have been forced to respond to a price increase, they might have raised their prices regardless of the likely consequences.[15] However, upon consideration of the evidence, this Court concludes that plaintiffs *were* aware of potential publisher response and that this awareness would have kept them from raising their subscription prices even if they had had price freedom earlier than September 1, 1973. *See Knutson, supra,* 383 F.Supp. at 1364 n.19A.

15. If that were the case, the Court could award plaintiffs damages for the profits they lost between the date they would have responded to price freedom by raising prices and the date the publisher would have responded by converting his distribution system. Because of the time lag in dealer response mentioned earlier, however, and the publisher's need to act quickly, this damage period would have been very short indeed.

16. "Q. Did you happen to discuss with any of the plaintiffs the emphasis that the circulation department placed upon maintenance and growth of circulation and volume at the Hayward Daily Review?"
"A. Yes, there was some discussions [*sic*] of the promotional activities of the circulation department.
"Q. Well, and the emphasis upon the part of the circulation management that the dealers' primary function was to develop circulation?
"A. Yes.

The presumption established by the Court of Appeals that plaintiffs were profit maximizers was partially based on the assumption that these dealers were knowledgeable businesspersons with the aptitude and inclination to act in their own self interest. After having observed the demeanor and having heard the testimony of these individuals during trial, this Court agrees; plaintiffs were sophisticated newsdealers who understood the dynamics of their industry and who therefore should be found to have been aware of the consequences of a price hike.

A number of plaintiffs admitted during trial that they had at least considered the impact of a dealer price hike on the publisher's profits. *See, e. g.,* Transcript, Vol. 7, Dec. 13, 1973, Morning Session, at 16; Transcript, Vol. 8, Feb. 5, 1974, at 135. In addition, the evidence demonstrates plaintiffs' awareness of the "market fact" that subscription price, circulation, and advertising revenues are all interrelated. *See* Transcript, Vol. 8, Feb. 5, 1974, at 142; Transcript, Vol. 14, Feb. 14, 1974, at 363–364. Moreover, their own expert economist, Dr. David Bradwell, testified during the remand trial that plaintiffs were aware of the publisher's need to maintain a high circulation, and that they would not have raised prices if it meant putting themselves out of business.[16]

\* \* \* \* \* \*

"Q. And the dealers recognized that, the extreme importance of that fact to circulation management?
"A. Oh, no question."
Transcript, Jan. 25, 1978, at 148–149.
"Q. Of course you recognize there are substantial differences in the factors which a publisher considered from those which a dealer considered, do you not?
"A. Yes.

\* \* \* \* \* \*

"Q. Do you assume that the dealer is equally [concerned] about the impact of his actions upon the newspaper firm?
"A. In a different way, yes.
"Q. In which way, Doctor Bradwell?
"A. Well, if he were to act in such a predatory way that he destroyed his source of supply, he would be out of business."
Transcript, Jan. 25, 1978, at 153, 155.

240

In light of this evidence, and plaintiffs' testimony that their pricing decisions would be influenced by long-term rather than by short-term objectives, *see* Transcript, Jan. 26, 1978, 1:30 P.M. Session, at 11, 40; Transcript, Jan. 27, 1978, at 47, 49, the Court concludes that plaintiffs would not have been "profit-maximizers." Surely they were aware that any action on their part to raise subscription prices—even if it would have been in their immediate self-interest—would in the long run have had disastrous consequences for their businesses. Any price hike or threat of price hike would have caused the publisher to convert to an employee distribution system or to take some action that would destroy plaintiffs' positions as independent newsdealers. Therefore, because the evidence shows that plaintiffs would not have raised their prices even if they had been free to do so, the Court can award only nominal damages.[17] This award will be trebled pursuant to 15 U.S.C. § 15. *See Newberry v. Washington Post Co., supra,* 438 F.Supp. at 483; *Siegfried v. Kansas City Star Co.,* 193 F.Supp. 427, 440 (W.D.Mo.1961), *aff'd,* 298 F.2d 1 (8 Cir.), *cert. denied,* 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).

Plaintiffs' damage award is significant in two respects. First, it incorporates the finding of the Court of Appeals—applicable here as the law of the case—that plaintiffs have established the *fact* of damages. *See* p. 230, *supra.* Second, it indicates that even though the fact of damages has been established, plaintiffs have not proven the *amount* of damages; they have failed to demonstrate to the Court's satisfaction that they suffered lost profits due to defendants' illegal maximum price restraint. In fact, the evidence points to the contrary conclusion, that the Sherman Act violation did not affect plaintiffs' profits.

In *Newberry, supra,* the court found that the publisher of the Washington Post violated Section 1 of the Sherman Act by illegally restraining the price at which its dealers sold the newspaper. Those plaintiffs who had raised their prices despite the restraint were awarded treble damages based on their evidence of lost profits. 438 F.Supp. at 483. The remaining plaintiffs received only nominal damages, however, because the Court found that

> "[there] is simply no proof that provides a basis for determining when, if ever, a price increase would have been attempted by any of [the plaintiffs] or in what amount * * *. The Court has found that [defendant restrained plaintiffs'] freedom to price without interference; but this does not establish that but for the Post's action, all prices would have been raised, or by what amount. * * * Cognizant of the Supreme Court's establishment of a relaxed standard of proof of the amount of damages once an antitrust violation has been shown [citation omitted], the Court concludes nonetheless that it would be the sheerest speculation to award more than nominal damages." 438 F.Supp. at 483.

In this case as well, the Court concludes that it would be sheer speculation, and in fact contrary to the evidence, to award more than nominal damages. *Cf. SCM Corp. v. Xerox Corp., supra,* 463 F.Supp. at 1017–1020 (D.Conn.1978) (evidence does not support plaintiff's lost profits damage theory). Accordingly, the Court concludes that plaintiffs are each entitled to an award of three dollars. *See Morning Pioneer Inc. v. Bismarck Tribune Co.,* 493 F.2d 383, 388 (8 Cir.), *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *Siegfried v. Kansas City Star Co., supra,* 298 F.2d 1, 6 (8 Cir.),

17. Although the record has not been fully developed, evidence of the Sacramento Union dealers' experience seems to support this conclusion. The Sacramento Union Dealership Agreements did not set any maximum resale prices; those dealers were free to charge whatever price they wished. *See* Transcript, Vol. 16, Apr. 16, 1974, at 74–75; Transcript, Vol. 16, Apr. 17, 1974, at 168, 232. However, none of them actually sold their papers at other than the publisher's suggested price. *See* Transcript, Jan. 25, 1978, at 134. This lends support to the Court's conclusion that because of the need for uniformity of prices and the need to maintain circulation at a level that would support advertising revenues, a newsdealer would not vary from his publisher's suggested resale price even if he or she were free to do so.

*cert. denied,* 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); *Newberry, supra,* 438 F.Supp. at 483; *United Exhibitors v. Twentieth Century Fox F. D. Corp.,* 31 F.Supp. 316, 317 (W.D.Pa.1940). *But see Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 909 n.4 (2 Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85, *rehearing denied,* 370 U.S. 920, 82 S.Ct. 1552, 8 L.Ed.2d 500 (1962) (dictum); *Ledge Hill Farms, Inc. v. W. R. Grace & Co.,* 230 F.Supp. 638, 640 (S.D.N.Y.1964).

Accordingly, IT IS HEREBY ORDERED that The Daily Review plaintiffs Joseph W. Berthiaume, Robert A. Dutra, Kenneth W. Jackson, Willard B. Kittredge, Jean E. Nyland, and Evan F. Williams are each awarded damages from defendants in the amount of three dollars ($3.00).

IT IS HEREBY FURTHER ORDERED that a hearing will be held on Thursday, May 3, 1979, at 9 A.M. to determine reasonable attorneys' fees. Counsel shall file memoranda accordingly.