**NORTHWEST PUBLICATIONS, INC.,
Plaintiff and Counter-Defendant,**

v.

**John D. CRUMB, et al., Defendants and
Counter-Claimants.**

**No. C–74–0692 SW.**

United States District Court,
N.D. California.

Feb. 17, 1984.

Timothy H. Fine, Patrick J. Carter, Garry Koenigsberg, Robert L. Gorman, Law Offices of Timothy H. Fine, San Francisco, Cal., for defendants, counter-claimants and third-party plaintiffs.

Khourie & Crew, Michael N. Khourie, Joel Linzner, San Francisco, Cal., for plaintiff, counter-defendant and third-party defendant.

## OPINION AND ORDER

SPENCER WILLIAMS, District Judge.

### FACTS

This case arises out of an action brought by plaintiff for declaratory relief from the court that it had cured an alleged violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff, a newspaper publisher, had a resale price maintenance provision in its contract with defendants, who were independent newspaper distributors. Under the terms of the agreement plaintiff set the price at which the newspapers were to be sold to subscribers. On March 29, 1974, plaintiff sent a notice of termination to its distributors and announced that it was converting to an employee distribution system. Plaintiff then filed this action for a declaration that the conversion cured the allegedly illegal price maintenance clause. Defendants filed a counterclaim for damages under § 4 of the Clayton Act, 15 U.S.C. § 15. On January 9, 1975, Judge Renfrew granted partial summary judgment in favor of defendants, ruling that the price-fixing provision in the distributorship agreement constituted resale price maintenance, a *per se* violation of § 1 of the Sherman Act.

This court denied plaintiff's motion to vacate the partial summary judgment, and the case proceeded to court trial on the issues of causation and damages resulting from the resale price fixing. All of the parties' other claims were dismissed prior to trial and thus are not the subject of this memorandum. From May 26 to June 3, 1983 the court heard testimony from all parties and from Dr. David Bradwell, a consulting economist called by counter-claimants. After considering the evidence presented, observing the demeanor of witnesses, and reviewing the depositions submitted by the parties, this court finds that counterdefendant Northwest Publications, Inc. prevails and that counterclaimants take nothing by this action.

Plaintiff/counter-defendant Northwest Publications, Inc. ("publisher") publishes two daily, paid circulation newspapers, *The Mercury*, a morning paper, and *The News*, an afternoon edition, and one Sunday paper, *The Mercury-News*. Most of its circulation is in Santa Clara County, California, and is heavily concentrated in the city and suburbs of San Jose, California.

Defendants/counter-claimants John Crumb and Hazel Romans were newspaper distributors for the morning *Mercury;* defendants/counter-claimants Daniel Poulson and Angeline Burman were newspaper distributors for the afternoon *News* (collectively "distributors"). All of the distributors were independent businesspersons who purchased newspapers from the publisher and distributed them to subscribers within a specified district, pursuant to a written agreement with the publisher. Under the terms of the agreement, the publisher established the price the distributors could set for subscriptions. Either party

could terminate the agreement on 30 days' written notice.

On May 30, 1973, the distributors' attorney, Timothy Fine, wrote a letter to the publisher charging that the resale price maintenance provision in the distribution agreement constituted a violation of Sherman Act § 1. Mr. Fine simultaneously notified his clients that it was his opinion that they were free to raise or lower their prices. On March 28, 1974, Daniel Polson announced the first district-wide dealer price increase for either *The Mercury* or *The News*. The publisher's notice of termination and suit followed. Because the publisher originally anticipated an early ruling from the Court, it agreed to postpone the terminations pending the Court's decision.

During the ensuing months, however, all of the named defendants raised subscription prices over the publisher's suggested price, causing the publisher large losses in circulation. On October 28, 1974, the publisher sent a second notice of termination, to be effective November 30, 1974, although the court action was not resolved. On November 29, 1974, District Judge Renfrew entered a stipulated preliminary injunction which prohibited the publisher from terminating the distributors absent "good cause" (which included circulation falling below a certain level). Defendants Crumb and Poulson were eventually terminated, while Romans and Burman resigned their distributorships in 1976 and 1980, respectively.

## LEGAL STANDARDS

■ Recovery under the antitrust laws for resale price maintenance requires a finding on three elements. First, an antitrust violation must be established; *i.e.*, claimant must show that the price maintenance agreement was illegal under Sherman Act § 1. Secondly, the fact of damages, or causation, must be established. This finding involves a "but for" analysis: claimant must show that "but for" the violation it would not have suffered the injury alleged. Finally, the amount of damages must be established with reasonable certainty.

Here the distributors allege that the illegal price-maintenance clause prevented them from raising their prices and thereby realizing higher profits. These lost profits, they allege, constitute the amount of damages they have suffered. The publisher's response to this allegation is that the distributors would not, in fact, have raised their prices absent the illegal clause. Thus, publishers claim, the causal link is missing.

Judge Renfrew, in his partial summary judgment ruling, found that the first element, antitrust violation, was met in this case. We will assume that the third element is also met: distributors have been injured in an amount equal to the profits they would have made before the termination was effective. This time period is at most 60 days. However, the distributors have failed to establish the second element, a causal link between the antitrust violation and the injury suffered. Thus, although there is a technical violation of the antitrust laws, we find that the distributors are not entitled to damages under § 4 of the Clayton Act because they have failed to establish causation.

■ In this Circuit, a standard of proof for antitrust injury in a price-fixing claim by newspaper distributors against a publisher is well established. Under this standard, once illegal antitrust activity has been proven, the court will presume that the distributors would have been profit maximizers had they not been illegally constrained. This presumption may be rebutted by a showing that the distributors would not in fact have raised their prices to the profit-maximizing level in the absence of the illegal activity. The evidence needed to rebut this presumption is that there was some other, entirely legal, competitive market force which prevented the distributors from raising their prices. *Knutson v. Daily Review, Inc.*, ("*Knutson*"), 548 F.2d 795 (9th Cir.1976), 468 F.Supp. 226 (Renfrew, J., 1979), *aff'd* 664 F.2d 1120 (9th Cir.1981).

The profit-maximizing price at which a distributor would choose to sell a newspaper to a subscriber is not necessarily the same as that which the publisher would choose. The goal of the distributor is to maximize subscription revenue. To reach this goal a distributor may be willing to lose some customers if he/she can charge a higher rate to the remaining subscribers. Thus, for example, a distributor will prefer selling 100 copies at 30 cents per copy over selling 110 copies at 25 cents per copy. In the former case the distributor will realize $30 in revenue, while in the latter case he/she will realize only $27.50 in revenue.

The publisher, on the other hand, obtains revenue from both subscriptions and advertising. An advertiser will pay more for an ad in a paper with a higher circulation. Thus, while a publisher who sells directly to the subscriber will realize $30 dollars in subscription revenue if he sells 100 copies at 30 cents per copy and only $27.50 if he sells 110 copies at 25 cents per copy, he may nevertheless lose more in advertising revenue than the $2.50 gained by the subscription price increase. The publisher, unlike the independent distributor, must strike a profit-maximizing balance between subscription and advertising revenue. Approximately 85% of the *Mercury/News* revenue came from advertising, with the remaining 15% from circulation during the relevant time period.

However, an independent distributor whose contract with the publisher can be terminated on short notice must take the publisher's interests into account if he wishes to retain his status as a distributor. Under *Knutson*, 468 F.Supp. 226, the publisher's concern about this profit-maximizing balance can legally result in a termination clause in the distributors' contracts. This clause will indirectly amount to an entirely legal, competitive market force which prevents the distributors from maximizing their short-term profits. If the evidence establishes first, that the distributors were aware of the trade-off between advertising and circulation revenue and were generally sophisticated businesspersons, and secondly, that they were aware of the

publisher's ability to terminate them on short notice, then the court may find that the dealers will act in their own self-interest to hold prices down. *Id.* at 239. In such situations, an illegal price-fixing clause has little bearing on the behavior of dealers since they are constrained by the publisher's own profit-maximizing behavior.

## DISCUSSION

 The behavior of the distributors here during the post-damage period fits the economic model. Although the distributors knew in May 1973 that the price-fixing clause was illegal and that they were free to raise their prices, none did so until April 1974, when Daniel Poulson raised his rates. The distributors offered as explanation at trial that their lawyer was negotiating a reduction in the rates charged by the publisher to the distributors which would have increased their profit margin without forcing them to raise their prices. The Court, however, finds this explanation less than complete. In the first place, the explanation shows that the distributors placed a high value on circulation and, knowing it would go down if they raised their prices, looked elsewhere for a means to raise their profit margin. Secondly, the distributors could have raised their prices and negotiated with the publisher at the same time, but they chose not to. Finally, although Daniel Poulson initially raised his prices on April 1, 1974 above the amount by which the publisher raised its prices on the same date, four days later he lowered his prices to match those of the publisher. This evidence indicates to the Court a real concern with loss of customers and a reluctance to raise prices.

In addition to the evidence of the distributor's actions during the post-damage period, the testimony of witnesses at trial shows that the *Knutson* standard for rebutting profit-maximization is met. The evidence shows first, that the publishers would have terminated the distributors if they had raised their prices, secondly, that

the distributors were aware that they would be terminated, and finally, that this awareness prevented them from raising their prices.

The evidence shows, as in *Knutson*, that if the distributors had raised their prices during the damage period the publisher would have terminated them under the 30-day provision in the distributorship agreement. Employees of Northwest Publications who had responsibility for distribution of the newspapers testified that they would have immediately terminated the distributors in response to a price increase. These witnesses gave as grounds for this action the resulting loss of advertising revenue and anticipated complaints from customers. As this testimony fits the economic model, the Court finds it credible. In addition, the behavior of the publisher during the postdamage period when the distributors actually raised their prices further supports the publisher's credibility. The publisher took immediate action to terminate the dealers following the announcement of the first price increase. Furthermore, the record shows that following the price increases, circulation did in fact drop significantly. Because the Court finds this evidence overwhelming, and we are cautioned against damage theories that fail to take into account the reasonable, profit-maximizing behavior of an antitrust defendant designed to protect its own business, *Murphy Tugboat v. Crowley*, 658 F.2d 1256, 1262 (9th Cir.1981), the Court finds that the counterdefendant publishers would have taken immediate steps to terminate the distributors if they had attempted to raise their prices.

Moreover, the distributors knew that the publisher would terminate them if they raised their prices. Each distributor testified that he/she would not have raised his/her price for fear of termination, but understandably each implicates the illegal clause. However, we discount this testimony insofar as it ignores the relationship of publisher and distributor along the economic model. As the *Knutson* court reasoned:

"the presumption established by the Court of Appeals that plaintiffs were profit maximizers was partially based on the assumption that these dealers were knowledgeable businesspersons with the aptitude and inclination to act in their own self-interest. After observing the demeanor and having heard the testimony of the individuals during trial, this court agrees; plaintiffs were sophisticated newsdealers who understood the dynamics of their industry and who therefore should be found to have been aware of the consequences of a price hike."

468 F.Supp. 226 at 239. It is evident from the record that the distributors had the sophistication to understand the consequences, with respect to their status as distributors, of a price increase. The distributors testified that they were aware of the direct correlation of circulation and advertising revenue and of the publisher's dependence on the latter for the bulk of its income. Since the distributors were aware of this relationship and also aware that they could be terminated on 30-days' notice, it is evident that they were fully aware that the publisher would act in its own interest and terminate them in the event of a price increase.

Finally, since the distributors were aware that the publisher would terminate them in the event of a price increase, we find that the distributors would not have raised their prices above those of the publisher. Because distributors who desire to keep their distributorships for more than a short period of time must take the publisher's profit-maximizing price into account, the long-run price which the distributors choose to set is the same as that which the publisher chooses. Under the economic model the price the publisher chooses is one which maintains the stability of the newspaper, reflecting a balance between circulation and advertising revenue. The distributors will also choose this price in order to maintain their status as distributors. The distributors before the Court demonstrated both the sophistication required to understand this price-balancing and an interest in holding their distributor-

**1128**

ships over the long term. Accordingly, the Court finds that they would not have raised their prices above those set by the publisher.

In presenting their damage claim at trial the distributors called Dr. David Bradwell, a consulting economist. Dr. Bradwell's testimony was based on erroneous assumptions, insufficient evidence, and faulty analysis. The Court gave no weight whatsoever to such testimony nor to the damage study which Dr. Bradwell prepared and the dealers offered.

The evidence in this case, as in *Knutson*, shows that the distributors had the necessary awareness and sophistication about the relationship of their pricing to publisher revenue, and of the consequences of raising their prices, to hold prices at the level set by the publisher. Accordingly, although the distributors were unable to raise their prices above those set by the publisher during the damage period and thus were injured, this injury was not caused by the publisher's violation of the antitrust laws. Rather, the publisher's own, entirely legal, interest in balancing circulation and advertising revenue forced the distributors to hold their prices down in order to preserve their status as distributors. Consequently, the Court finds that counterclaimants have proven no damages as a result of the illegal price-fixing clause in the distributorship agreement. The Court finds in favor of counterdefendant Northwest Publications, Inc. and awards costs to Northwest as the prevailing party.

IT IS SO ORDERED.